S12A1430. HEIDT v. THE STATE.
(736 SE2d 384)

BLACKWELL, Justice.

Craig Heidt was tried by an Effingham County jury and convicted of the murders of his father and brother, an aggravated assault and aggravated battery upon his mother, burglary, attempt to commit arson in the first degree, and three counts of possession of a firearm during the commission of a felony. Heidt appeals, contending that the evidence is insufficient to sustain his convictions and that the trial court erred when it disqualified one of his lawyers for a conflict of interest, denied his motion to disqualify the trial judge, denied his motion to change venue, attempted to rehabilitate prospective jurors who already had formed an opinion of his guilt, admitted certain evidence of his prior difficulties with his brother, and rejected his *Brady*[1] claim. We see no error and affirm.[2]

1. Construed in the light most favorable to the verdict, the evidence shows that Heidt had a sexual relationship with his sister-in-law, Robin, who was married to his youngest brother, Carey. In August 2008, his father, Philip, confronted Robin about the affair and, according to Robin, yelled at her, pushed her arm, and snatched her keys as she attempted to leave the scene of the confrontation.

---

[1] *Brady v. Maryland*, 373 U. S. 83 (83 SC 1194, 10 LE2d 215) (1963).

[2] The events that form the basis for the convictions occurred on August 25, 2008. Heidt was indicted on May 28, 2009 and charged with two counts each of malice murder, aggravated assault, and burglary, one count each of aggravated battery and attempt to commit arson in the first degree, and three counts of possession of a firearm during the commission of a felony. Trial commenced on November 30, 2010, and the jury returned its verdict on December 9, 2010, finding Heidt guilty on all counts. Heidt was sentenced to imprisonment for consecutive terms of life for the murders, imprisonment for a consecutive term of twenty years for aggravated assault, imprisonment for a consecutive term of twenty years for aggravated battery, imprisonment for a consecutive term of twenty years for burglary, imprisonment for a consecutive term of ten years for attempt to commit arson in the first degree, and imprisonment for consecutive terms of five years for each count of possession of a firearm during the commission of a felony. The second aggravated assault and burglary counts merged with the crimes for which Heidt was sentenced. Heidt filed a motion for new trial on January 24, 2011, and he amended it on December 1, 2011, again on December 13, 2011, and yet again on December 16, 2011. The trial court denied the motion for new trial as amended on February 23, 2012. Heidt timely filed his notice of appeal on March 8, 2012, and the case was docketed in this Court for the September 2012 term and argued on September 11, 2012.

Afterwards, Robin called Heidt and told him about his father confronting her. Heidt was upset about the confrontation, and he told Robin that, if Philip and Carey "weren't careful[,] he would play 'old school' on them."

On August 23, 2008, Heidt and Robin observed a low-flying helicopter circling the hunting cabin in which they were staying. Philip and Carey had arranged for a friend to attempt to photograph Heidt, Robin, and their vehicles from the helicopter. The next day, August 24, Robin asked Carey about the helicopter, and he confirmed that it was part of an effort to obtain proof of her affair with his brother. Carey and Robin then had a "heated discussion," which ended with Carey leaving to spend the night at the home of his parents in Springfield, Georgia.[3] Robin called Heidt "not long after Carey left" and told him what had happened.

Early on the morning of August 25, someone entered the home in Springfield, using a spare key that typically was hidden in a storage room under the carport. The intruder went into the room in which Carey was sleeping and shot him with a 12-gauge shotgun. The intruder then went into the bedroom that Philip shared with Heidt's mother, Linda, and shot both Philip and Linda. The intruder poured gasoline throughout the home and broke out a window, apparently in an attempt to make it appear as though someone had entered the home forcibly. The intruder, however, failed to remove the spare key from the door lock.

Carey and Philip succumbed to their injuries, but Linda was able to call for emergency assistance and ultimately survived. Although Linda was unable to identify the intruder, a police officer observed that her demeanor "was somewhat different" when Heidt came into her hospital room on the day of the murders. According to that officer, Linda "didn't seem to interact" with Heidt, and her pulse rose when he entered the room. The officer also testified that Heidt twice inquired as to how long police officers would remain at the hospital with his mother.

Even before police officers determined that the intruder had used a shotgun, Heidt spontaneously volunteered to the officers that his shotgun, boots, and gas can were missing, and when officers asked Heidt about his relationship with Robin, he denied the affair. According to other testimony at trial, Heidt was one of only a few people who knew that a spare key to the home of his parents was hidden under their carport, several 12-gauge shotgun shells were found in his truck

---

[3] This was the first night in 13 years that Carey spent at the home of his parents without Robin.

on the day of the murders, and four days after the murders, Heidt was seen with three bruises on his upper arms, consistent with him having recently fired three shots from a shotgun.[4] In addition, there was evidence that, about a week before the murders, Heidt consulted a realtor about purchasing some real property for himself and Robin, that Heidt did not have the financial resources to purchase the property but claimed that he soon would be coming into some money, and that Heidt said he had reason to believe that he would inherit significant money upon the death of his parents.[5]

Heidt contends that the evidence is insufficient to sustain his convictions, pointing especially to conflicting expert testimony at trial about the possible causes of his bruises. As we have explained before, "[i]t is the role of the jury to resolve conflicts in the evidence and to determine the credibility of witnesses, and the resolution of such conflicts adversely to the defendant does not render the evidence insufficient." *Allen v. State*, 288 Ga. 263, 264 (1) (702 SE2d 869) (2010) (citation and punctuation omitted). Given our obligation to view the evidence in the light most favorable to the verdict and to leave questions of credibility and the resolution of conflicts in the evidence to the jury, we conclude that the evidence in this case was sufficient to authorize a rational trier of fact to find Heidt guilty beyond a reasonable doubt of the crimes for which he was convicted. *Jackson v. Virginia*, 443 U. S. 307 (99 SC 2781, 61 LE2d 560) (1979). See also *Ward v. State*, 262 Ga. 293, 296 (4) (417 SE2d 130) (1992); *Porter v. State*, 258 Ga. 94, 96 (1) (365 SE2d 438) (1988).

2. Heidt contends that the trial court abused its discretion when it disqualified one of his two lawyers, Manubir Arora, on the motion of the State in April 2010.[6] The trial court found that Arora had a conflict of interest because he also represented Robin, who was anticipated to testify in the prosecution of Heidt, and who herself was charged with intimidating a witness in his prosecution. The Sixth Amendment guarantees the right of the accused in a criminal prosecution "to have the Assistance of Counsel for his defen[s]e," and Article I, Section I, Paragraph XIV, of the Georgia Constitution of 1983 likewise guarantees that "[e]very person charged with an

---

[4] Heidt claimed that the bruises were a result of a bathroom fall on the day before the bruises were observed, but expert testimony at trial showed that the location and color of the bruises were not consistent with that story.

[5] Philip apparently had changed his will only a few days before his murder, reducing the amount that Heidt would receive upon his death. No evidence showed, however, that Heidt was aware that the will had been changed.

[6] After the trial court issued the order of disqualification, Heidt sought to appeal the order to this Court, but we dismissed that appeal because Heidt failed to comply with the interlocutory appeal procedures of OCGA § 5-6-34 (b).

offense against the laws of this state shall have the privilege and benefit of counsel." As the United States Supreme Court has explained, "an element of this right is the right of a defendant who does not require appointed counsel to choose who will represent him." *United States v. Gonzalez-Lopez*, 548 U. S. 140, 144 (II) (126 SC 2557, 165 LE2d 409) (2006); see also *Wheat v. United States*, 486 U. S. 153, 159 (II) (108 SC 1692, 100 LE2d 140) (1988) ("[T]he right to select and be represented by one's preferred attorney is comprehended by the Sixth Amendment . . . ."); *Powell v. Alabama*, 287 U. S. 45, 53 (53 SC 55, 77 LE 158) (1932) ("It is hardly necessary to say that, the right to counsel being conceded, a defendant should be afforded a fair opportunity to secure counsel of his own choice."); *Registe v. State*, 287 Ga. 542, 544 (2) (697 SE2d 804) (2010) ("One element of the right to counsel in criminal prosecutions, as guaranteed by the Sixth Amendment . . . [and] the Georgia Constitution of 1983, is the right of a defendant who does not require appointed counsel to choose who will represent him."). Indeed, the right to select the counsel of choice is, the United States Supreme Court has said, "the root meaning of the constitutional guarantee" of the right to the assistance of counsel. *Gonzalez-Lopez*, 548 U. S. at 147-148 (II).

The right to counsel of choice is not, however, absolute. *Wheat*, 486 U. S. at 159 (II) ("The Sixth Amendment right to choose one's own counsel is circumscribed in several important respects."); see also *Gonzalez-Lopez*, 548 U. S. at 144 (II). Among the limitations of the right is the settled principle that "a defendant does not have a right to be represented by an attorney who is ethically prohibited from doing so, most commonly due to a conflict of interest."[7] *Registe*, 287 Ga. at 544 (2); see also *Wheat*, 486 U. S. at 160 (II); *United States v. Campbell*, 491 F3d 1306, 1310 (II) (11th Cir. 2007). Accordingly, the courts "must recognize a presumption in favor of [an accused's] counsel of choice, but that presumption may be overcome not only by a demonstration of actual conflict [of interest] but by a showing of a serious potential for conflict." *Wheat*, 486 U. S. at 164 (II). Whether a lawyer should be disqualified from representing an accused in a criminal prosecution as a result of a conflict of interest is a question committed to the sound discretion of the trial court. *Registe*, 287 Ga. at 544 (2). We see no abuse of discretion in this case.

When the State moved to disqualify Arora, it showed that Arora — who was assisting another lawyer in the defense of Heidt — also

---

[7] Other limitations of the right include that "a defendant may not insist on representation by an attorney he cannot afford or who for other reasons declines to represent the defendant." *Wheat*, 486 U. S. at 159 (II).

was representing Robin, who had been arrested in February 2010 and charged with intimidating a witness in the case against Heidt, and whom the State intended to call as a witness at Heidt's trial. Although Heidt claims that both he and Robin consented to the dual representation, clients may not consent to a conflict that "involves circumstances rendering it reasonably unlikely that the lawyer will be able to provide adequate representation to one or more of the affected clients." Ga. Rules of Professional Conduct 1.7 (c) (3). And in the context of a criminal prosecution, the courts have noted that the consent of the accused "does not always cure the problem [of a conflict]," especially considering the independent interests of the judiciary " 'in ensuring that criminal trials are conducted within the ethical standards of the profession and that legal proceedings appear fair to all who observe them.' " *Registe*, 287 Ga. at 544 (2) (quoting *Wheat*, 486 U. S. at 160 (II)); see also *Gonzalez-Lopez*, 548 U. S. at 151-152 (IV) ("Nor may a defendant . . . demand that a court honor his waiver of conflict-free representation."). While Heidt and Robin may not have foreseen any conflict between their interests at the time that they consented to the dual representation, we know that their interests ultimately were not aligned, inasmuch as Robin ended up testifying against Heidt, and the criminal charges against her were dismissed. Because the prospects of Arora advising Robin about any deal that might be proposed by the State to secure her testimony against Heidt or cross-examining her on behalf of Heidt were rife with serious ethical problems, the trial court did not abuse its discretion when it determined that Arora's representation of Robin would materially and adversely affect his representation of Heidt and disqualified Arora for that reason. See *Fleming v. State*, 246 Ga. 90, 91-93 (1) (270 SE2d 185) (1980); see also *Registe*, 287 Ga. at 551.

3. Heidt also contends that the trial court erred when it denied his motion to disqualify the trial judge. Prior to trial, Heidt moved for the trial judge to recuse because the judge twice had issued search warrants related to his case and because he had signed ten orders for records relating to the case. Heidt also argued that the trial judge had made an out-of-court statement that, according to Heidt, showed a bias against him. A judge from a neighboring judicial circuit heard the motion and denied it, and we find no error.[8]

In order to require disqualification of a judge, an alleged bias "must stem from an extra-judicial source and result in an opinion on the merits on some basis other than what the judge learned from his

---

[8] Heidt filed an application for interlocutory review of the order denying his motion to recuse, but we denied that application.

participation in the case." *Birt v. State*, 256 Ga. 483, 485 (4) (350 SE2d 241) (1986) (citations and punctuation omitted). Here, the involvement of the trial judge with the issuance of search warrants and orders for records was directly related to Heidt's case and was not "extra-judicial." And at the hearing on the motion to recuse, the testimony about the judge's out-of-court statement merely showed that the judge had expressed "some sort of agreement" to a statement of a third party that Heidt would not receive a fair trial in Effingham County, but it failed to show that the judge had revealed any bias against Heidt. Consequently, Heidt failed to show that the trial judge's impartiality might reasonably be questioned, see Canon 3 (E) (1) of the Code of Judicial Conduct, and the trial court did not err when it denied his motion to disqualify the trial judge. See *Turner v. State*, 280 Ga. 174, 175-176 (626 SE2d 86) (2006).

4. Heidt claims that the trial court erred when it denied his motion for a change of venue. He contends that he was not able to secure an impartial jury in Effingham County because of pretrial publicity and gossip about the case. See OCGA § 17-7-150 (a) (1). To prevail on a motion for a change of venue pursuant to OCGA § 17-7-150 (a), a defendant must show "either that the setting of the trial was inherently prejudicial or that the jury selection process showed actual prejudice to a degree that rendered a fair trial impossible." *Harvey v. State*, 284 Ga. 8, 9 (3) (660 SE2d 528) (2008) (citation omitted). And the decision to grant or deny a motion for a change of venue lies within the discretion of the trial judge and will not be disturbed on appeal absent an abuse of discretion. *Edmond v. State*, 283 Ga. 507, 508 (2) (661 SE2d 520) (2008). We see no abuse of discretion here.

With regard to inherent prejudice,

> even in cases of widespread pretrial publicity, situations where such publicity has rendered a trial setting inherently prejudicial are extremely rare . . . [, and t]he record must establish that the publicity contained information that was unduly extensive, factually incorrect, inflammatory or reflective of an atmosphere of hostility.

*Gear v. State*, 288 Ga. 500, 502 (2) (705 SE2d 632) (2011) (citations and punctuation omitted). Here, Heidt alleges that there was a lot of gossip, rumor, and innuendo about his affair with Robin, but he does not claim that the stories about the affair were untrue or even disputed at trial, and he fails to show that the pretrial publicity was inflammatory or created a hostile atmosphere. As a result, the record in this case does not support a claim of inherent prejudice. See *Gear*

*v. State*, 288 Ga. at 502 (2); see also *Thomas v. State*, 290 Ga. 653, 656 (3) (723 SE2d 885) (2012).

While Heidt points to what he says was an "astoundingly high" number of jurors who were excused for cause after stating that they had heard about the case and had already formed opinions about his guilt or innocence, the record simply does not support his claim. To the contrary, the record shows that of the fifty-nine jurors who were questioned during voir dire, only six of them were excused because pretrial publicity made it impossible for them to render a verdict based solely on the evidence. See *Jenkins v. State*, 268 Ga. 468, 469-470 (2) (491 SE2d 54) (1997) (procedure for calculating percentage of jurors excused for cause resulting from pretrial publicity is to compare number of jurors so excused to total number of jurors questioned). Because an excusal percentage of approximately ten percent is well below the rate that would indicate actual prejudice rendering a fair trial impossible, the trial court did not abuse its discretion by denying the motion for a change of venue. See *Gear v. State*, 288 Ga. at 502 (2) (excusal rate of 17 percent did not require change of venue); *Miller v. State*, 275 Ga. 730, 736 (4) (571 SE2d 788) (2002) (excusal rate of 15 percent did not require change of venue).

5. Heidt asserts that the trial court erred when it attempted to rehabilitate certain prospective jurors who said that they already had formed an opinion about his guilt. According to Heidt, the trial court should have removed these prospective jurors for cause immediately, instead of asking them if they could decide the case based on the evidence presented in the courtroom and the law as charged by the court. But Heidt made no objection to the trial court's rehabilitation questions at trial, and he has waived this claim of error on appeal. See *Riley v. State*, 278 Ga. 677, 685 (6) (A) (604 SE2d 488) (2004). And in any event, it is well settled that a trial court is permitted to objectively question prospective jurors in a manner calculated to determine if they are unalterably prejudiced against the defendant. See *Anderson v. State*, 276 Ga. 389, 390 (2) (578 SE2d 890) (2003).

6. Heidt also contends that the trial court erred when it allowed a woman who had counseled Carey about his marital problems to testify about an incident that Carey described to her, in which Heidt threatened Carey's life at their parents' home. Heidt claims that the State failed to show that Carey's statement was sufficiently trustworthy to meet the necessity exception to the hearsay rule, see OCGA § 24-3-1 (b), noting that Linda testified at trial that she did not recall such an incident. But Heidt did not object to the testimony at trial, and he has not preserved this issue for appeal. See *Jeffers v. State*, 290 Ga. 311, 314 (4) (a), (b) (721 SE2d 86) (2012).

In any event, the trial court did not err when it admitted this testimony under the necessity exception. For non-testimonial hearsay evidence to be admissible under the necessity exception, not only must the declarant be unavailable and his statement be relevant to a material fact and be more probative as to that fact than other evidence that may be procured and offered, but the statement also must exhibit "particularized guarantees of trustworthiness." *McNaughton v. State*, 290 Ga. 894, 897-898 (3) (b) (725 SE2d 590) (2012); *Evans v. State*, 288 Ga. 571, 572 (2) (707 SE2d 353) (2011). A trial court generally does not abuse its discretion by finding sufficient guarantees of trustworthiness where a declarant made statements to a witness who was a close family member or friend, in whom the declarant placed confidence, and to whom the declarant turned for help with personal problems. *McNaughton*, 290 Ga. at 898-899 (3) (b). Here, it was shown that the witness was "like a second mother" to Carey, that she, at Robin's request, had counseled and advised Carey about his marital problems, and that Carey had no reason to lie to her. Moreover, her testimony was consistent with the testimony of other witnesses, including two witnesses who testified about another incident in which Carey and Heidt threatened to kill each other.

7. Finally, Heidt claims that the trial court erred when it denied his motion for new trial, rejecting his *Brady* claim. During the trial, the Effingham County Sheriff's Office was contacted by a man whom Robin had hired to reassemble a shotgun. This man delivered this shotgun to the sheriff, noting that it was of the same make and model as the shotgun that Heidt had reported missing on the day of the murders, and of the same make and model that the State was arguing at trial was used to kill Philip and Carey. Heidt contends that the shotgun was exculpatory and that the State improperly kept its existence from him in violation of *Brady*.

To prevail on his *Brady* claim, Heidt was required to show that the State possessed evidence favorable to him, that he did not possess the evidence and could not obtain it himself with reasonable diligence, that the State suppressed the favorable evidence, and that, if the evidence had been disclosed to him, a reasonable probability exists that the outcome of the proceeding would have been different. *Blackshear v. State*, 285 Ga. 619, 622 (5) (680 SE2d 850) (2009). The trial court concluded that Heidt failed to show these things by competent evidence in the record. Our review of the record confirms that, at least as to the necessary element of suppression by the prosecution, Heidt failed to come forward with any evidence that the State failed to disclose the existence of the shotgun. Indeed, the *only* evidence at the hearing on the motion for new trial that even touched upon the suppression element was the testimony of the sheriff, and

the sheriff testified that, on the day after the shotgun was delivered to him, he told both the prosecuting attorney and Heidt's lawyer in the courtroom about the shotgun, and everyone agreed that the shotgun was not related to the murders.[9] Heidt argues that the testimony of the sheriff is inaccurate, but he points to no evidence of record disputing it.[10] Accordingly, the trial court did not err when it rejected the *Brady* claim and denied the motion for new trial. See id.

*Judgment affirmed. All the Justices concur.*

DECIDED JANUARY 7, 2013 —
RECONSIDERATION DENIED FEBRUARY 4, 2013.

*William D. Bonds*, for appellant.
*Richard A. Mallard, District Attorney, Michael T. Muldrew, Assistant District Attorney, Samuel S. Olens, Attorney General, Paula K. Smith, Senior Assistant Attorney General, Benjamin H. Pierman, Assistant Attorney General*, for appellee.

---

[9] Although not supported by the record, the State contends that the parties knew that the shotgun delivered to the sheriff during trial was not related to the murders because its serial number revealed that it was one of five guns that had been owned by Carey, that previously had been turned over to law enforcement before Heidt was arrested, and that had been returned to a lawyer representing Robin in September 2009.

[10] The trial court did not expressly credit the testimony of the sheriff and, in fact, seemed to express some concern about it. But the trial court also noted that "nothing offered by [Heidt] shows that the State either willfully or inadvertently failed to disclose the existence of the gun at trial." Proving each element of a *Brady* claim is the burden of the defendant. *Watkins v. State*, 276 Ga. 578, 583 (4) (581 SE2d 23) (2003). So, even if the testimony of the sheriff were to be disregarded entirely, the record would be silent as to suppression, and for that reason, Heidt could not prevail on his *Brady* claim.