**FOURTH DIVISION**
**BARNES, P. J.,**
**RAY and PETERSON, JJ.**

**NOTICE: Motions for reconsideration must be** *physically received* **in our clerk's office within ten days of the date of decision to be deemed timely filed.**
**http://www.gaappeals.us/rules**

**February 4, 2016**

# In the Court of Appeals of Georgia

A15A1956. MICHAEL v. THE STATE.

BARNES, Presiding Judge.

In this case involving an automobile collision in which five people were killed and one person was seriously injured, a Fulton County jury found Aimee Michael guilty of five counts of homicide by vehicle in the first degree, one count of serious injury by vehicle, six counts of hit and run, one count of reckless driving, one count of failure to maintain lane, and one count of tampering with evidence. Michael filed a motion for new trial, which the trial court denied. On appeal, Michael challenges the sufficiency of the evidence. She also contends that the trial court erred in excluding a computer animation video created by her accident reconstruction expert and expert testimony about the precision immobilization technique ("PIT") maneuver used by police officers to strike a suspect's car. For the reasons discussed below, we affirm.

Following a criminal conviction, we view the evidence in the light most favorable to the jury's verdict. *Sidner v. State*, 304 Ga. App. 373, 374 (696 SE2d 398) (2010). So viewed, the evidence showed that Michael was the 22-year-old driver of a gold BMW involved in the deadly automobile collision on Camp Creek Parkway in Fulton County on Easter Sunday, April 12, 2009. A Mercedes and Volkswagen also were involved in the collision and were at the scene when emergency personnel and law enforcement officers arrived. However, Michael fled the scene after the collision and was not apprehended by the police until several days later, after she had the damage to her BMW repaired.

Camp Creek Parkway runs east-west and has two lanes of travel in each direction that are separated by a grass median. On the day in question, a married couple and their two children were in a silver Mercedes traveling in the left-hand (or inside) lane of the eastbound lanes of travel. Michael was driving her gold BMW in the right-hand (or outside) lane of the eastbound lanes. Traveling in the opposite direction, a mother and her young daughter were in a Volkswagen in the left-hand (or inside) lane of the westbound lanes.[1]

---

[1] The mother and daughter were in the Volkswagen, while the father and son were ahead of them traveling westbound in a separate car. The father and son heard the subsequent collision, immediately stopped at the next intersection, jumped out of

The BMW and Mercedes were side-by-side as they traveled in the two eastbound lanes. The BMW suddenly collided with the Mercedes, causing both vehicles to lose control and cross over the median into the westbound lanes of travel. The Mercedes then collided with the Volkswagen traveling westbound, and the Mercedes burst into flames.[2] The four family members in the Mercedes and the daughter in the Volkswagen died as a result. The mother in the Volkswagen lacerated her liver and spleen and broke her legs, foot, collarbone, ribs, and hip. She underwent emergency surgery and extensive physical rehabilitation. In contrast, Michael was not physically injured, and while her BMW had been damaged on the left side, she was able to drive away from the scene.

Two other drivers called 911, and a paramedic and an EMT in an ambulance in the vicinity saw the Mercedes engulfed in flames, called their dispatcher to report the collision, and immediately responded to the scene. The fire department and police

their car, and ran back to the collision scene.

[2] After the Mercedes collided with the Volkswagen, the Mercedes began to spin and hit a Honda that also was traveling westbound and pushed it into the guardrail. The driver and passengers in the Honda escaped from their car as the Mercedes burst into flames.

also responded to the scene of the collision. By the time they arrived, Michael had already fled in her BMW.

Michael drove back to her house a few miles from Camp Creek Parkway where she lived with her mother. She usually parked her BMW in the driveway, but she parked it inside the garage with the door closed. The next day, Michael contacted a car repairman whom she knew and invited him to her house under the pretense of discussing health insurance policies.[3] After the repairman arrived at her house and they discussed insurance, Michael showed the repairman her BMW parked in the garage, leading him to believe that the damage to the car was from an old accident. The repairman provided Michael a quote for the repairs, and she agreed to have him perform the work and provided a $1,000 deposit.

The repairman drove the BMW to the automobile repair shop where he worked. He repaired the damage to the BMW, including the damage to the left front fender and the left rear quarter panel and strut, and he had the total car repainted. The repairs and paint job took one week to complete. Upon completion, Michael's mother picked up the BMW from the repair shop and paid the balance for the work in cash.

---

[3] Michael was an insurance salesperson.

Although Michael fled from the scene and had her damaged BMW repaired and repainted, police investigators were able to determine that another car was involved in the collision based on the tire marks on the roadway. Additionally, pieces of the BMW's bumper and undercarriage were found at the scene, leading investigators to conclude that the third car was a gold BMW with damage to the left side. There was extensive local media coverage of the collision, and the police released the information about the BMW to the public.

Michael's neighbors heard about the collision and the description of the BMW on the news and became suspicious that Michael might be involved, particularly when they did not see the BMW in the driveway for several days after the collision. Although Michael denied to her neighbors that she had been involved in the collision, several of them reported their suspicions to the police.

The first time the police went to Michael's neighborhood in response to the neighbors' reports shortly after the collision, they saw no BMW. When the lead investigator later returned to the neighborhood to follow up on the reports, he found a BMW parked in the driveway of Michael's house that smelled of fresh paint and had a new bumper piece on the left side consistent with the BMW involved in the

collision. The investigator also looked under the BMW and saw that pieces were missing from the undercarriage consistent with the debris found at the accident scene.

The lead investigator sought and obtained search warrants for Michael's house and for the BMW. Michael arrived at the house while the police were executing the search warrants and agreed to come to the police station for an interview. After waiving her rights under *Miranda v. Arizona*, 384 U. S. 436 (86 SCt 1602, 16 LE2d 694) (1966), Michael spoke with police investigators in a recorded interview that was later played for the jury.

During the recorded police interview, Michael initially claimed that the BMW belonged to her mother and that she had only driven the car around the neighborhood and a few times to work, and she denied any involvement in the collision or that the car had been recently repaired. But when informed by the investigators about their investigation and that pieces of the debris found at the scene matched her BMW, Michael admitted that she had been the driver of the BMW involved in the collision, had left the scene, and had her car repaired. Michael told the investigators that she was driving down the roadway when she quickly turned her steering wheel to the right because she thought the Volkswagen was coming into her lane. She admitted, however, that she may have just been "too close to the line" herself. According to

6

Michael, after steering to the right, she tried to correct by quickly turning back to the left, but the BMW then started spinning and crossed over the median to the westbound lanes of travel. Once the BMW stopped spinning, Michael said that she realized that the Mercedes had burst into flames. Michael never claimed during the interview that the Mercedes hit her first.

After interviewing Michael, investigators interviewed the car repairman who repaired the BMW and had it repainted. He described to investigators the damage to the left side of the BMW that had been repaired at Michael's direction. He later testified at trial about the repairs and the paint job.

Following an initial delay, investigators obtained recordings of the 911 calls made after the collision. One of the 911 callers had been driving in the right-hand lane of the eastbound lanes of travel on Camp Creek Parkway directly in front of Michael's gold BMW and had witnessed the collision from her rearview mirror. The lead investigator contacted the witness, who had identified herself in the 911 call, and conducted a recorded interview.

The witness told the investigator and later testified at trial that she had been driving down Camp Creek Parkway when she heard a "popping sound" that she initially thought might be her car. After hearing the popping sound, the witness

7

looked in her rearview mirror and saw a gold car traveling behind her in the same lane and a silver Mercedes in the left lane. According to the witness, the gold car and the silver Mercedes "were next to each other," and neither car appeared to be in distress at that point. The witness repeatedly looked in her rearview mirror as she continued driving down the road, and after about 30 seconds, she saw the gold car move a little to the right, then back to the left, and then crash into the side of the Mercedes. The witness explained that on impact, "the Mercedes was being moved by the gold car into the divider that was in the middle," after which she saw flames, stopped at a red light, and called 911. The witness stated that the gold car hit the Mercedes, that she never saw the Mercedes drift into the other lane or hit the gold car, and that the Mercedes did not drive out of control until it was struck by the gold car.

Michael was arrested, indicted, and tried before a jury on five counts of homicide by vehicle in the first degree, one count of serious injury by vehicle, six counts of hit and run, one count of reckless driving, one count of failure to maintain lane, and one count of tampering with evidence.[4] At trial, the defense admitted that Michael was the driver of the gold BMW involved in the collision, fled the scene

---

[4] Michael's mother was arrested, indicted, and pled guilty to tampering with evidence and hindering the apprehension of a criminal. She is not a party to this appeal.

afterwards, had the BMW repaired, and initially lied to the police. But the State and defense presented different theories as to the cause of the collision, with the State arguing that Michael in her BMW caused the crash, and the defense arguing that the Mercedes caused the crash.

The State's theory of causation was that Michael, while driving her BMW east on Camp Creek Parkway, veered to the right and then overcorrected to the left, leaving her lane of travel and crashing into the Mercedes in the lane beside her. According to the State, Michael's actions caused the Mercedes to cross over the median and collide with the Volkswagen traveling westbound, resulting in the deaths and serious injuries that occurred. To support its theory of causation, the State relied upon the testimony of the eyewitness whose car had been in front of Michael's BMW on Camp Creek Parkway, Michael's statements during her recorded police interview, and Michael's admitted efforts to evade the police and destroy evidence after the collision. The State also relied upon accident reconstruction testimony from two experts that focused on the tire marks left on the eastbound lanes by the Mercedes and BMW.

The defense's theory of causation was that the Mercedes had encroached into the lane of the BMW, bumping or tapping the BMW on the rear driver's side quarter

panel, thereby setting in motion the chain of events that resulted in the crashes. The

defense presented the testimony of its own accident reconstruction expert to support

its theory. Michael elected not to testify.

After hearing all the evidence, the jury found Michael guilty on all counts of

the indictment. The trial court sentenced her to a total of 50 years, to serve 36 years

in custody. Michael filed a motion for new trial, challenging the sufficiency of the

evidence and certain evidentiary rulings made during the trial. Following a hearing,

the trial court denied the motion, resulting in this appeal.

1. Michael contends that there was insufficient evidence of causation to support

her convictions for homicide by vehicle in the first degree (OCGA § 40-6-393 (b))[5]

and serious injury by vehicle (OCGA § 40-6-394).[6] Specifically, Michael contends

---

[5] OCGA § 40-6-393 (b) provides: "Any driver of a motor vehicle who, without malice aforethought, causes an accident which causes the death of another person and leaves the scene of the accident in violation of subsection (b) of Code Section 40-6-270 [the hit-and-run statute] commits the offense of homicide by vehicle in the first degree and, upon conviction thereof, shall be punished by imprisonment for not less than three years nor more than 15 years."

[6] OCGA § 40-6-394 provides in part: "Whoever, without malice, shall cause bodily harm to another by depriving him of a member of his body, by rendering a member of his body useless, by seriously disfiguring his body or a member thereof, or by causing organic brain damage which renders the body or any member thereof useless through the violation of Code Section 40-6-390 [the reckless driving statute] . . . shall be guilty of the crime of serious injury by vehicle."

10

that there was insufficient evidence that her BMW encroached into the other eastbound lane on Camp Creek Parkway and struck the Mercedes, causing the Mercedes to lose control and collide with the Volkswagen in the westbound lane, resulting in the deaths and serious injuries that occurred. We are unpersuaded.[7]

When a defendant challenges the sufficiency of the evidence to support her criminal convictions, we ask only "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (Citation omitted; emphasis in original.) *Jackson v. Virginia*, 443 U. S. 307, 319 (III) (B) (99 SCt 2781, 61 LE2d 560) (1979). "So long as there is some competent evidence, even though contradicted, to support each element of the State's case, the jury's verdict will be upheld." *McLeod v. State*, 245 Ga. App. 668, 669 (1) (538 SE2d 759) (2000). It is

---

[7] The trial court merged Michael's convictions for hit and run, reckless driving, and failure to maintain lane into her other convictions for sentencing purposes. We do not consider the sufficiency of the evidence with respect to those merged offenses. See *Nelson v. State*, 277 Ga. App. 92, 96 (1) (b) (625 SE2d 465) (2005). To the extent that Michael challenges her conviction for tampering with evidence (OCGA § 16-10-94 (a)), her admissions during her police interview and the trial testimony of the car repairman clearly were sufficient to support her conviction on this count. Moreover, the defense conceded during closing argument that Michael was guilty of hit and run and tampering with evidence.

11

the function of the jury, rather than this Court, to weigh the evidence, resolve conflicts in the lay and expert testimony, and draw reasonable inferences from the evidence. *Jones v. State*, 315 Ga. App. 427, 427-428 (1) (727 SE2d 216) (2012). And in cases of conflicting evidence over causation, the question is one for the jury to resolve. *Hood v. State*, 193 Ga. App. 701, 702-703 (1) (389 SE2d 264) (1989). See *Caffey v. State*, 210 Ga. App. 395, 396-397 (2) (436 SE2d 102) (1993).

Applying these principles, we conclude that the evidence adduced at trial and summarized above was sufficient to authorize a rational jury to find Michael guilty beyond a reasonable doubt of the charged offenses. *Jackson*, 443 U. S. at 319 (III) (B). The testimony of the State's accident reconstruction experts, combined with the testimony of the eyewitness who was driving in front of Michael's BMW and Michael's statements during her police interview, entitled the jury to find that Michael caused the collision by veering out of her lane of travel and crashing into the Mercedes, setting into motion the chain of events that resulted in the serious injuries and deaths that occurred in this case. See, e.g., *Gentry v. State*, 236 Ga. App. 820, 821-822 (1) (513 SE2d 528) (1999) (evidence presented by State, including testimony of accident reconstruction expert, was sufficient to show causation and prove vehicular homicide, serious injury by vehicle, and reckless driving); *Hood*, 193 Ga.

12

App. at 702-703 (1) (evidence presented by State, including expect testimony of accident reconstruction specialist, was sufficient to support vehicular homicide conviction). The jury also could reasonably infer from Michael's flight from the scene, her destruction of evidence by having the BMW repaired and repainted, and her initial lying to the police that Michael was conscious of her own guilt for the collision. See *Thomas v. State*, 320 Ga. App. 101, 105 (2) (739 SE2d 417) (2013) (noting that "flight from the scene presents evidence of consciousness of guilt"); *Dennard v. State*, 241 Ga. App. 794, 796 (527 SE2d 884) (2000) (pointing out that an "attempt to hide from or elude the police constitutes circumstantial evidence of . . . consciousness of guilt").

Michael nevertheless argues that the State presented circumstantial evidence of causation and that this evidence failed to exclude all reasonable hypotheses except that of her guilt. See OCGA § 24-4-6 (2010).[8] Her argument is without merit because

[8] Because this case was tried in 2010, Georgia's former evidence code applies. See Ga. Laws 2011, p. 99, § 101 (revised Evidence Code "shall become effective on January 1, 2013, and shall apply to any motion made or hearing or trial commenced on or after such date"). Former OCGA § 24-4-6 provided: "To warrant a conviction on circumstantial evidence, the proved facts shall not only be consistent with the hypothesis of guilt, but shall exclude every other reasonable hypothesis save that of the guilt of the accused." Former OCGA § 24-4-6 is carried forward in OCGA § 24-14-6 of the revised evidence code.

13

the reasonable hypothesis rule applies only in the narrow context where *all* of the evidence against the accused was circumstantial. See *Lewis v. State*, 304 Ga. App. 831, 833 (1) (698 SE2d 365) (2010). Here, there was direct evidence in the form of eyewitness testimony and Michael's statements during her police interview. See id. (defendant's admissions were direct evidence of guilt); *Green v. State*, 298 Ga. App. 17, 22 (1) (679 SE2d 348) (2009) (eyewitness account was direct evidence of guilt). The reasonable hypothesis rule therefore has no application in this case.

It is true that Michael presented opinion testimony from her own accident reconstruction expert that the collision was caused by the Mercedes rather than the BMW. But the jury was entitled to credit the testimony of the State's two accident reconstruction experts over that of the defense expert. See *Heidt v. State*, 292 Ga. 343, 345 (1) (736 SE2d 384) (2013) (noting that it is the jury's role to resolve conflicting expert testimony). The jury also was entitled to find that the defense expert's testimony conflicted with and was less credible than the account of the eyewitness driving in front of the BMW at the time of the collision, who testified that, from her rearview mirror, she saw the gold car veer left, crash into the Mercedes, and push the Mercedes across the median, and never saw the Mercedes drift into the other

14

lane or hit the BMW.[9] See *Farmer v. State*, 223 Ga. 364, 366 (3) (155 SE2d 14) (1967) (jury may consider what weight, if any, to afford the testimony of an expert, like the testimony of any other witness). As Georgia courts have repeatedly emphasized, when there is conflicting testimony and expert evidence, "the resolution of such conflicts adversely to the defendant does not render the evidence insufficient," and thus Michael has failed to assert a persuasive basis for reversal. (Citation and punctuation omitted.) *Noel v. State*, 297 Ga. 698, 699 (1) (777 SE2d 449) (2015).

2. Michael sought to introduce for demonstrative purposes a computer animation video illustrating how the collision allegedly occurred in the opinion of the her accident reconstruction expert. The video showed a simulation from an "overhead perspective view" of the Mercedes drifting into the other lane and striking the BMW, causing the BMW to lose control and setting off the chain of events that culminated in the serious injuries and deaths that occurred. The beginning of the video stated that

---

[9] As previously noted, the eyewitness testified that she heard an unidentified "popping sound" before seeing the BMW hit the Mercedes. Notably, however, the eyewitness further testified that she did not believe that the popping sound – which she heard approximately 30 seconds before the crash when the vehicles did not appear to be in any distress – had come from the Mercedes hitting the BMW.

the simulation was based on the Mercedes traveling 65 mph and the BMW traveling 55 mph.

The State filed a motion in limine to exclude the computer animation video, which the trial court granted. The trial court excluded the computer animation video from use as demonstrative evidence on the grounds that (a) the defense had belatedly disclosed the video in bad faith and in violation of prior discovery orders, thereby prejudicing the State; (b) the defense had failed to show a sufficient scientific or factual basis for the specific depiction of the collision in the video; and (c) there was a "significant difference of opinion" between the State and defense over how the collision occurred that made the use of a video simulation inappropriate.

On appeal, Michael contends that the trial court abused its discretion in excluding the computer animation video. Pretermitting whether the trial court erred in excluding the video, we find no basis for reversal. "Error alone is not automatically grounds for a new trial but is subject to scrutiny for harmless error. It is axiomatic that the exclusion of evidence which is merely cumulative is not reversible error." (Punctuation and footnotes omitted.) *Brown v. State*, 268 Ga. App. 24, 27-28 (2) (601 SE2d 405) (2004). Although Michael's accident reconstruction expert was not permitted to use the computer animation video, the expert still was able to use

16

photographs, diagrams, and model cars to discuss and illustrate his opinion of how the collision occurred to the jury. The expert thus had ample opportunity to explain his theory of the collision through demonstrative and illustrative evidence other than the computer animation video. Under these circumstances, even if the trial court erred by excluding the computer animation video, the error does not constitute grounds for reversal of the judgment. See id. at 27-28 (2); *Wilbanks v. State*, 165 Ga. App. 876, 879 (4) (303 SE2d 144) (1983) (physical precedent only).

3. As previously noted, when the police investigators interviewed Michael, she never claimed that the collision started by the Mercedes striking her BMW. Michael's accident reconstruction expert opined, however, that the Mercedes had in fact encroached into the other eastbound lane and bumped the left rear panel of the BMW, causing the BMW to lose control and thus setting in motion the collision that occurred.

To illustrate how the collision was initiated by the Mercedes, the defense sought to analogize to the PIT maneuver used by police officers to immobilize a suspect's vehicle in a car chase. During his testimony, the defense accident reconstruction expert described the PIT maneuver, noting that an officer normally performs the maneuver by using the front right of his patrol car to strike the left rear

of a suspect's car. The expert further explained that the extent to which a suspect realizes that his car has been struck by the patrol car can vary, and that sometimes the "sensation is little, if at all."

The trial court granted the State's motion to exclude additional testimony from the defense expert regarding the PIT maneuver. Specifically, the defense proffered that the accident reconstruction expert would testify that in carrying out a PIT maneuver, a trained officer would have turned to the right after making the initial contact with the suspect's car, preventing a further collision. The defense argued that the proffered expert testimony would help the defense compare and contrast to jurors the performance of a controlled PIT maneuver with what occurred after the initial impact between the BMW and Mercedes. The trial court found that this proffered testimony about what an officer performing a PIT maneuver is trained to do after making the initial contact with a suspect's car was irrelevant.

Michael contends that the trial court committed reversible error by excluding the proffered expert testimony regarding PIT maneuvers as irrelevant.[10] "The

___

[10] Michael argues in her brief that the trial court excluded expert testimony about "the physics of a PIT maneuver," but the trial court's ruling was not that broad. Rather, the trial court's ruling was limited to the specific proffered testimony discussed above.

admission or exclusion of evidence which is objected to on the ground of relevancy lies within the sound discretion of the trial court, whose decision will not be disturbed on appeal absent a clear abuse of discretion." *Davis v. State*, 301 Ga. App. 484, 488 (3) (687 SE2d 854) (2009). "Evidence which does not in any reasonable degree tend to establish the probability of the issues of fact in controversy is irrelevant and inadmissible." (Citation and punctuation omitted.) *Craig v. State*, 205 Ga. App. 691, 692 (1) (423 SE2d 417) (1992).

The trial court did not abuse its discretion in finding that the proffered expert testimony was irrelevant. The defense sought to have its expert testify how a trained police officer would have carried through with the PIT maneuver to avoid a collision *after* making the initial contact with the suspect's vehicle. But this proffered expert testimony was unrelated to, and would not have assisted the jury in resolving, the causation question that was in controversy, namely, which of the two cars (the BMW or Mercedes) first struck the other car. The trial court thus acted within its discretion by excluding the proffered expert testimony, "as such testimony would not shed light in any reasonable degree on any fact in controversy." *Davis*, 301 Ga. App. at 488 (3).

*Judgment affirmed. Ray and Peterson, JJ., concur.*