In the Supreme Court of Georgia

Decided:   March 21, 2016

S15A1721.  VEAL v. THE STATE.

NAHMIAS, Justice.

Appellant Robert Veal challenges his convictions for numerous crimes, including murder and rape, committed in the course of two armed robberies on November 22, 2010.  He contends that the evidence at trial as to one set of crimes was insufficient to corroborate the testimony of his accomplice; we reject that contention and affirm all of the convictions.  Appellant also contends that the two counts charging him with criminal street gang activity should have merged for sentencing; we reject that contention as well, although we have identified a merger error made in Appellant's favor on an armed robbery count, which the trial court should correct on remand.  Finally, Appellant, who was 17 ½ years old at the time of the crimes, contends that the trial court erred in sentencing him to life without parole for malice murder.  Based on the United States Supreme Court's recent decision in Montgomery v. Louisiana, 136 SCt 718 (2016), we agree that Appellant's LWOP sentence must be vacated, and we

therefore remand the case for resentencing on the murder count.[1]

1. Viewed in the light most favorable to the verdicts, the evidence at trial showed the following. On the night of the crimes, Lisa McGraw and her boyfriend, Charles Boyer, returned from a trip to a convenience store to her apartment complex in the Virginia Highlands neighborhood of Atlanta. They were walking toward her apartment when Boyer returned to his car to retrieve something he had forgotten. As McGraw continued toward the apartment, she felt a gun placed to her head and heard a voice from behind ordering her not to

---

[1] On January 21, 2011, a Fulton County grand jury indicted Appellant and several other defendants for a series of allegedly gang-related crimes. Appellant was charged with the malice murder of Charles Boyer; two counts of felony murder (based on aggravated assault and possession of a firearm by a convicted felon); four counts of aggravated assault with a deadly weapon (against Boyer, John Davis, Joseph Oliver, and C.T.); possession of a firearm during the commission of a felony; five counts of armed robbery (against Boyer, Lisa McGraw, Davis, Oliver, and C.T.); rape, aggravated sodomy, and kidnapping with bodily injury of C.T.; kidnapping of Davis; false imprisonment of Oliver; and two counts of participation in criminal street gang activity. Appellant and co-indictee Tamario Wise were tried together from October 1 to 11, 2012. The jury found Appellant guilty of all counts except felony murder based on possession of a firearm by a convicted felon and the counts of aggravated assault against Oliver and C.T.. The trial court then sentenced Appellant to serve life in prison without parole for malice murder; six consecutive life sentences for the rape, aggravated sodomy, and four of the armed robbery convictions; and a total of 60 consecutive years for possession of a firearm during the commission of a felony, kidnapping, false imprisonment, and the two counts of participation in criminal street gang activity. The remaining felony murder verdict was vacated by operation of law, and the trial court merged the remaining counts – which, as explained in Division 4 below, was error with respect to the count of armed robbery against Boyer. On December 3, 2012, Appellant filed a motion for new trial, which he amended with new counsel on November 26, 2014. After an evidentiary hearing, the trial court denied the motion on March 11, 2015. Appellant filed a timely notice of appeal, and the case was docketed in this Court for the September 2015 term and submitted for a decision on the briefs.

2

turn around. McGraw realized that two men were behind her, and that a third man was with Boyer.

The men ordered Boyer and McGraw to walk to their apartment and to hand over their keys. McGraw gave the men her purse, and then she and Boyer tried to run away. McGraw made it safely into her neighbor's apartment, but Boyer did not. Chris Miller, a neighbor walking his dog, heard a commotion and approached to get a better look. Miller saw Boyer holding a grocery bag and facing three assailants. When Miller saw that one of the assailants had on a mask, he realized that a robbery was occurring and turned back. Miller then heard three gunshots and ran inside his apartment to call 911. The three men fled the scene. Boyer died from gunshot wounds to the torso. His injuries were consistent with his being in a struggle and trying to block a gun from shooting at him and then being shot again while trying to free himself.

Several hours later, John Davis saw three men drive up in a gold Toyota sedan as he walked outside his apartment in the Grant Park neighborhood, which is a few miles away from Virginia Highlands. The men confronted Davis and ordered him at gunpoint to go to his apartment, and all four men went inside, where they found Davis's roommate, C.T., in bed with her boyfriend, Joseph

3

Oliver. The assailants tied up Davis and Oliver in separate rooms. They then moved C.T. down the hallway to Davis's bedroom, where they raped and sodomized her. DNA from C.T.'s rape kit was later determined to match Appellant's.

The police put together a task force to find the perpetrators of these crimes and other similar crimes in the area. Two days later, the police tracked Boyer's missing cell phone to a black Toyota SUV, which had been abandoned at the Lakewood MARTA Station; the SUV had been stolen by Tamario Wise and another individual a few days before the Boyer shooting. The police also found C.T.'s cell phone in a bag with other stolen phones and belongings on the side of Bicknell Road.

About a month later, the police located and interviewed Raphael Cross as a suspect in the November 22 crimes. During the interview, Cross named Appellant and Wise as his accomplices in both armed robberies. Cross said that the group set out that evening with the intent of finding people to rob, and Appellant and Wise, who were armed, had killed Boyer. Following the interview, Cross was arrested and Appellant and Wise were located and arrested. Further investigation found text messages between Appellant, Wise, and Cross

4

talking about wiping down the black SUV to remove any fingerprints after the SUV had been shown on the television news after the murder. Appellant also sent a text to Wise that said, "PITTSBURGH JACKCITY 15 ROBERTHO F**K EVERYBODY." Evidence presented at trial showed that Appellant, Wise, and Cross were members of the Jack Boys gang, which hails from the Pittsburgh area of Atlanta. Additional evidence, including the bag of stolen cell phones and belongings found on Bicknell Road as well as testimony from other victims, showed that the Jack Boys had been involved in several armed robberies in Atlanta prior to the November 22 crimes.

At the joint trial of Appellant and Wise, Cross testified as follows. On the evening of the crimes, Appellant and Wise picked Cross up in a dark colored SUV, and the three men drove to the Virginia Highlands neighborhood. They pulled up at an apartment complex where they saw a man and a woman walking. Appellant and Wise exited the vehicle to rob the couple, and Cross got out shortly after. He saw the man struggle with Appellant and Wise, and then saw Wise shoot the man. After the shooting, the three men returned to the SUV and then switched to a gold Toyota Camry before continuing to the Grant Park area and committing the crimes against Davis, Oliver, and C.T.

5

Appellant and Wise did not testify. Appellant did not dispute his guilt of the charges related to the Grant Park crimes (to which he was linked by his DNA), but argued that he was not present during Boyer's shooting.

When viewed in the light most favorable to the verdicts, the evidence presented at trial and summarized above was sufficient as a matter of constitutional due process to authorize a rational jury to find Appellant guilty beyond a reasonable doubt of the crimes for which he was convicted. See Jackson v. Virginia, 443 U.S. 307, 319 (99 SCt 2781, 61 LE2d 560) (1979). See also OCGA § 16-2-20 (defining parties to a crime); Vega v. State, 285 Ga. 32, 33 (673 SE2d 223) (2009) ("'It was for the jury to determine the credibility of the witnesses and to resolve any conflicts or inconsistencies in the evidence.'" (citation omitted)).

2. Appellant asserts that his convictions related to the Virginia Highlands crimes must be reversed because the State presented insufficient evidence to corroborate the accomplice testimony of Cross identifying Appellant as a participant. Under former OCGA § 24-4-8:

> The testimony of a single witness is generally sufficient to establish a fact. However, in certain cases, including . . . felony cases where the only witness is an accomplice, the testimony of a single witness

6

is not sufficient.  Nevertheless, corroborating circumstances may dispense with the necessity for the testimony of a second witness, except in prosecutions for treason.[2]

We have explained that under this statute,

"sufficient corroborating evidence may be circumstantial, it may be slight, and it need not of itself be sufficient to warrant a conviction of the crime charged.  It must, however, be independent of the accomplice testimony and must directly connect the defendant with the crime, or lead to the inference that he is guilty.  Slight evidence from an extraneous source identifying the accused as a participant in the criminal act is sufficient corroboration of the accomplice to support a verdict."

Clark v. State, 296 Ga. 543, 547 (769 SE2d 376) (2015) (citation omitted).

In this case, Cross's testimony that Appellant participated with him and Wise in the Virginia Highlands crimes was corroborated by the evidence that the three men were all members of the Jack Boys gang and just hours later, Appellant committed a similar armed robbery with Cross and Wise in Grant Park, a nearby neighborhood.  In addition, text messages that Appellant sent to Cross and Wise after the murder asked if they had wiped fingerprints off the black Toyota SUV in which Boyer's stolen cell phone was found.  And the cell phone stolen from C.T., Appellant's Grant Park rape victim, was found on

---

[2]  This case was tried under Georgia's old Evidence Code.  In our new Evidence Code, this provision is found at OCGA § 24-14-8.

Bicknell Road with other items stolen by the Jack Boys. Viewed as a whole, the evidence corroborating Cross's testimony was sufficient to satisfy the requirement of former OCGA § 24-4-8. See Alatise v. State, 291 Ga. 428, 432 (728 SE2d 592) (2012).

3. Appellant was convicted and sentenced separately for two counts of participation in criminal street gang activity based on his participation in the murder of Boyer and the rape of C.T. while associated with the Jack Boys gang. OCGA § 16-15-4 (a) provides:

> It shall be unlawful for any person employed by or associated with a criminal street gang to conduct or participate in criminal street gang activity through the commission of any offense enumerated in paragraph (1) of Code Section § 16-15-3.

Under OCGA § 16-15-3 (1), "criminal gang activity" means "the commission, attempted commission, conspiracy to commit, or solicitation, coercion, or intimidation of another person to commit any of the following offenses," including murder, see § 16-15-3 (1) (J), and rape, see § 16-15-3 (1) (C).

Appellant contends that the trial court should have imposed only one sentence for criminal street gang activity, even though he committed two offenses separately enumerated under § 16-15-3 (1) at different locations and

8

different times against different victims. Nothing in the statute requires that all gang-related offenses be gathered into a single gang activity charge or that all such offenses must merge for sentencing. Instead, the statute makes clear that it can be violated "through the commission of *any* [enumerated] offense," OCGA § 16-15-4 (a) (emphasis added), and § 16-15-4 (m) says that "[a]ny crime committed in violation of this Code section shall be considered a separate offense." Under the circumstances of this case, Appellant's contention fails as a matter of fact and of law.

4. While the merger error suggested by Appellant does not exist, in reviewing his sentences we have identified a merger error that was made in his favor, which the trial court should correct on remand. See Hulett v. State, 296 Ga. 49, 54 (766 SE2d 1) (2014) (explaining that this Court may correct a merger error noticed on direct appeal even if the issue was not raised by the parties). The trial court merged the count charging Appellant with armed robbery against Boyer (Count 54) into the malice murder count (Count 47). But those counts do not merge, "'because malice murder has an element that must be proven (death of the victim) that armed robbery does not, and armed robbery has an element (taking of property) that malice murder does not.'" Id. at 55-56 (citation

9

omitted). Accordingly, we vacate the trial court's judgment as to Count 54 and direct the court on remand to sentence Appellant for the additional armed robbery. See id. at 56.

5. Finally, Appellant, who was 17 ½ years old at the time of his crimes, contends that his sentence of life without parole (LWOP) for his malice murder conviction constitutes cruel and unusual punishment in violation of the Eighth Amendment to the United States Constitution. The Supreme Court of the United States recently made it clear that he is correct.

(a) Over the past decade, the Supreme Court has applied its "evolving standards of decency" theory of the Eighth Amendment to promulgate ever-increasing constitutional restrictions on the states' authority to impose criminal sentences on juvenile offenders. In 2005, the Court held that the Eighth Amendment now categorically forbids imposing a death sentence on juveniles, which the Court defined categorically as offenders who had not yet turned 18. See Roper v. Simmons, 543 U.S. 551, 568, 574 (125 SCt 1183, 161 LE2d 1) (2005) (deeming Stanford v. Kentucky, 492 U.S. 361 (109 SCt 2969, 106 LE2d 306 (1989), which just 16 years earlier had upheld the death penalty for offenders older than 16, "no longer controlling"). Five years later, the Court

10

held that the Eighth Amendment now categorically prohibits sentencing a juvenile to serve life in prison without possibility of parole for an offense other than homicide. See Graham v. Florida, 560 U.S. 48, 82 (130 SCt 2011, 176 LE2d 825) (2010). And two years after that, the Court held that the Eighth Amendment also bars "*mandatory* life without parole [sentences] for those under the age of 18 at the time of their crimes." Miller v. Alabama, 132 SCt 2455, 2460 (2012) (emphasis added). See also id. at 2469 ("We therefore hold that the Eighth Amendment forbids a sentencing scheme that mandates life in prison without possibility of parole for juvenile offenders.").

(b)　This case was tried three months after Miller came down. After the jury found Appellant guilty of malice murder (and many other crimes) on October 11, 2012, the trial court put off his sentencing for more than five weeks, to November 19. At the sentencing hearing, however, neither party offered any new evidence, nor did either party or the court mention Miller or its holding.

In arguing in mitigation of punishment, Appellant's trial counsel did, however, focus on the fact that his client was "very young at the time [of the crimes]. He was 17." Counsel noted Appellant's remorse for the rape of C.T.,

11

although Appellant then (as now) claimed to have had no involvement in the murder of Charles Boyer and the other Virginia Highland crimes. Counsel asserted that Appellant was vulnerable to Wise's solicitation to become involved in the crimes, and asked the court to "show some mercy" to Appellant because he was not a "lost cause" and "given some time, which he is obviously going to get, . . . he is going to be a changed person at some point." Counsel added that "[a]t 17, . . . you think differently than when you are 40. And . . . when he gets to be an older man, Judge, he is going to wake up and realize that." Noting that the State was going to ask for a life without parole sentence, Appellant's counsel argued that "it's going to be a waste of a life, . . . because I don't believe that he is going to be the kind of person that would do that for his entire life, these kind[s] of crimes."

In response, the prosecutor noted that the court had heard from "many, many victims" at Wise's sentencing hearing the week before and urged the court to consider that information in sentencing Appellant.[3] The prosecutor

---

[3] The transcript of Wise's sentencing hearing is not in the record on appeal, so we cannot tell if Appellant and his counsel were present. If not, the trial court's reliance in sentencing Appellant on information presented outside his presence could raise concerns about his constitutional right to be present, although that right may be waived in some circumstances and Appellant has not raised the issue. See, e.g., Dawson v. State, 283 Ga. 315, 321-322 (658 SE2d 755) (2008). We note

12

emphasized that this is a "brutal case" with respect to both the Virginia Highlands and Grant Park crimes, and he recommended the maximum LWOP sentence for the murder, arguing that the deterrent effect of imposing a penalty for murder greater than the life sentences Appellant faced for his other crimes "outweighs the slim possibility that he may have some moment of self-reflection 30 years down the road."

When it came time for sentencing, the trial court made no explicit mention of Appellant's age or its attendant characteristics, saying only: "based on the evidence and, in particular – please make sure all cell phones are turned off [] – it's the intent of the court that the defendant be sentenced to the maximum." The court then imposed a sentence of life without parole for the murder to run consecutively to the six consecutive life-with-parole sentences plus the 60 more consecutive years the court imposed for the other convictions (with another armed robbery sentence still to be imposed on remand).

Two years later, with the assistance of new counsel, Appellant filed an amended motion for new trial, raising for the first time a claim that his LWOP

---

the issue only as a caution with regard to Appellant's re-sentencing on remand.

13

murder sentence was unconstitutional under Miller. At the hearing on the motion, neither party offered any new evidence on this issue. Appellant's new counsel argued, however, that the trial court had not made any "specific findings of fact" at sentencing as to why the LWOP punishment was proper for Appellant, who was "technically a minor" at the time of the crimes. As a remedy, Appellant asked for a new sentencing hearing.

The trial court denied the motion. Citing this Court's decisions in Jones v. State, 296 Ga. 663, 666-667 (769 SE2d 901) (2015), and Brinkley v. State, 291 Ga. 195, 196 (728 SE2d 598) (2012), the court first held that Appellant's constitutional challenge to his sentence was untimely, as it had not been raised before sentencing but rather for the first time two years later in his amended motion for new trial. The court then alternatively denied the claim on the merits, stating: "As the Court indicated at that time, its sentence was based upon the evidence in the case which included [Appellant's] involvement in several savage and barbaric crimes and also included evidence of [Appellant's] age."

(d) Had this appeal been decided before Montgomery, we might have upheld the trial court's rulings on Appellant's belated Miller-based Eighth Amendment claim. To begin with, because Miller did not purport to prohibit

14

LWOP sentences for juvenile murderers, so long as sentencing courts properly exercise discretion in imposing such sentences, Miller appeared to establish a *procedural* rule – a *process* which, if the sentencing court did not follow it correctly, would result in a juvenile's LWOP sentence being not void but voidable, in that the same sentence might be imposed on remand in a given case if the court the second time around properly followed the process. After all, the Miller majority said: "Our decision does not categorically bar a penalty for a class of offenders or type of crime – as, for example, we did in Roper or Graham. Instead, it mandates only that a sentencer follow a certain process – considering an offender's youth and attendant characteristics – before imposing a particular penalty." Miller, 132 SCt at 2471.

As this Court explained in Von Thomas v. State, 293 Ga. 569 (748 SE2d 446) (2013),

> Whether a sentence amounts to "punishment that the law does not allow" [rendering the sentence void] depends not upon the existence or validity of the factual or adjudicative predicates for the sentence, but whether the sentence imposed is one that legally follows from a finding of such factual or adjudicative predicates.

Id. at 571-572. Although claims that a sentence is void (i.e., illegal) are not subject to general waiver or procedural default rules, a defendant does forfeit a

15

claim that his sentence was merely voidable (i.e., erroneous) if he does not raise the claim in timely and proper fashion. See id. at 573. See also Tolbert v. Toole, 296 Ga. 357, 361 n.8 (767 SE2d 24) (2014) (explaining that "Georgia's customary procedural default rule, which holds that claims not raised at trial and enumerated on appeal are waived, does not apply to a claim that a criminal conviction or sentence was void on jurisdictional or other grounds," although such claims may be subject to other procedural limitations); Nazario v. State, 293 Ga. 480, 485-486 (746 SE2d 109) (2013) (explaining that void conviction and void sentence claims may be considered for the first time on direct appeal and in other proper post-trial proceedings). Nor could Appellant excuse his failure to raise his Miller claim at or before his sentencing by asserting that Miller was new law for his case, see Brinkley, 291 Ga. at 197 n.1, because Miller was decided several months before his sentencing. Thus, as the trial court recognized, Appellant's Miller claim appeared to be procedurally barred because it was raised too late under this Court's procedural holdings in Jones and Brinkley.

We might also have upheld the trial court's alternative ruling on the merits of Appellant's Miller claim. We have explained that Georgia's murder

16

sentencing scheme does not implicate the core holding of Miller, because "OCGA § 16-5-1 does not under any circumstance *mandate* life without parole but gives the sentencing court discretion over the sentence to be imposed after consideration of all the circumstances in a given case, including the age of the offender and the mitigating qualities that accompany youth." Bun v. State, 296 Ga. 549, 550-551 (769 SE2d 381) (2015) (emphasis in original). See also Foster v. State, 294 Ga. 383, 387 (754 SE2d 33) (2014) (similarly rejecting a facial Eighth Amendment challenge to OCGA § 16-5-1 based on Miller).[4]

As for the trial court's exercise of that discretion, although at the sentencing hearing the court did not explicitly reference Appellant's age (which was just six months short of adulthood) in imposing the LWOP murder sentence, the court had heard considerable argument regarding that factor as well as other circumstances of Appellant and the case, and the court had also heard the evidence at trial; the court then explained in its order denying the motion for new trial that the life without parole "sentence was based upon the

[4] What was OCGA § 16-5-1 (d) at the time of Appellant's sentencing is now § 16-5-1 (e) (1); it says, with emphasis added, "A person convicted of the offense of murder shall be punished by death [a penalty not applicable to juveniles after Roper], by imprisonment for life without parole, *or* by imprisonment for life." The other sentencing provision of the murder statute, OCGA § 16-5-1 (e) (2), establishes a maximum sentence of 30 years for second degree murder.

17

evidence in the case which included [Appellant's] involvement in several savage and barbaric crimes and also included evidence of [Appellant's] age." In previous cases, this Court indicated that the sentencing court's discretion under <u>Miller</u> was fairly broad, so long as the trial court considered the defendant's youth. See <u>Jones</u>, 296 Ga. at 667 (affirming an LWOP murder sentence against a <u>Miller</u> claim where the trial court "explained that it based its sentence on balancing Appellant's youth against the 'vicious, mean, violent behavior and the adult conduct that was engaged in,' which included the murder of not one but two innocent bystanders"); <u>Bun</u>, 296 Ga. at 551 n.5 (suggesting that an as-applied <u>Miller</u> claim would have failed where "the trial court's order and [the] sentencing transcript make clear that the trial court considered Bun's youth and its accompanying attributes in making its sentencing decision and whatever the significance attributed to Bun's youth, the trial court found it was outweighed by the severity of his crimes, his criminal history, and his lack of remorse").

But then came <u>Montgomery</u>.

(e) <u>Montgomery</u>'s principal holding – that <u>Miller</u> applies retroactively in state habeas corpus proceedings – is irrelevant to this case, both because <u>Miller</u> was decided before Appellant was sentenced and because this

18

case is here on direct appeal. Nevertheless, the explication of Miller by the majority in Montgomery demonstrates that our previous understanding of Miller – and the trial court's ruling on Appellant's Miller claim – was wrong both as to the issue of procedural default and as to which juvenile murderers a court actually has discretion to sentence to serve life without parole.

First, while Montgomery acknowledges that "Miller's holding has a procedural component," it explains that the process discussed in Miller was really just a "procedure through which [a defendant] can show that he belongs to the [constitutionally] protected class." 136 SCt at 734, 735. Put another way, although Miller did not outlaw LWOP sentences for the category of *all* juvenile murderers, Montgomery holds that "Miller announced a substantive rule of constitutional law" that "the sentence of life without parole is disproportionate for the *vast majority* of juvenile offenders," with sentencing courts utilizing the process that Miller set forth to determine whether a particular defendant falls into this *almost-all* juvenile murderer category for which LWOP sentences are banned. Id. at 736 (emphasis added).

> A hearing where "youth and its attendant characteristics" are considered as sentencing factors is necessary to separate those juveniles who may be sentenced to life without parole from those

19

who may not. The hearing does not replace but rather gives effect to <u>Miller</u>'s substantive holding that life without parole is an excessive sentence for children whose crimes reflect transient immaturity.

Id. at 735.

And a sentence imposed in violation of this *substantive* rule – that is, an LWOP sentence imposed on a juvenile who is not properly determined to be in the very small class of juveniles for whom such a sentence may be deemed constitutionally proportionate – "is not just erroneous but contrary to law and, as a result, void." Id. at 731. It follows, <u>Montgomery</u> concludes, that state collateral review courts that are open to federal law claims must apply <u>Miller</u> retroactively if a petitioner challenges his sentence under the Eighth Amendment. See id. at 731-732. And it follows, as a matter of Georgia procedural law, that Appellant's <u>Miller</u> claim – now understood to be a substantive claim that, if meritorious, would render his sentence void – could be properly raised in his amended motion for new trial and in this direct appeal, despite his failure to raise the claim before he was sentenced. See <u>Nazario</u>, 293 Ga. at 487.[5] To the extent <u>Jones</u>, <u>Brinkley</u>, or any other Georgia appellate case

---

[5] We note in this regard that under Georgia law, a finding of a statutory aggravating factor that would support a death penalty was, until 2009, a statutory requirement to sentence a murderer

20

holds otherwise, it is hereby disapproved.

The Montgomery majority's characterization of Miller also undermines this Court's cases indicating that trial courts have significant discretion in deciding whether juvenile murderers should serve life sentences with or without the possibility of parole. Miller noted that, "given all we have said in Roper, Graham, and this decision about children's diminished culpability and heightened capacity for change, we think appropriate occasions for sentencing juveniles to this harshest possible penalty will be *uncommon*." Miller, 132 SCt at 2469 (emphasis added). Miller also indicated that what was essential was that the sentencing court have the discretion to consider an offender's "youth and its attendant characteristics, along with the nature of his crime," in deciding whether a lesser sentence (like life with the possibility of parole) was more appropriate than a life without parole sentence. Id. at 2460.

The Montgomery majority explains, however, that by *uncommon*, Miller meant *exceptionally rare*, and that determining whether a juvenile falls into that

---

to life without parole – and the failure to make such a finding contemporaneously with the imposition of a LWOP sentence rendered the sentence void and subject to correction by motion to vacate sentence made long after the conviction. See Pierce v. State, 289 Ga. 893, 896-897 (717 SE2d 202) (2011).

21

exclusive realm turns not on the sentencing court's consideration of his age and the qualities that accompany youth along with all of the other circumstances of the given case, but rather on a specific determination that he is *irreparably corrupt*.[6] Thus, <u>Montgomery</u> emphasizes that a life without parole sentence is permitted only in "*exceptional* circumstances," for "the *rare* juvenile offender who exhibits such *irretrievable depravity* that rehabilitation is *impossible*"; for those "*rarest* of juvenile offenders . . . whose crimes reflect *permanent incorrigibility*"; for "those *rare* children whose crimes reflect *irreparable corruption*" – and not, it is repeated twice, for "the vast majority of juvenile offenders." 136 SCt at 733-736 (emphasis added). The Supreme Court has now made it clear that life without parole sentences may be constitutionally imposed

---

[6] While it is not sufficient simply to consider a juvenile offender's "'diminished culpability and greater prospects for reform,'" it is important that the sentencing court explicitly consider the "three primary ways" that these characteristics of children are relevant to sentencing, as explained in <u>Miller</u> and <u>Montgomery</u>:

> "First, children have a lack of maturity and an underdeveloped sense of responsibility, leading to recklessness, impulsivity, and heedless risk-taking. Second, children are more vulnerable to negative influences and outside pressures, including from their family and peers; they have limited control over their own environment and lack the ability to extricate themselves from horrific, crime-producing settings. And third, a child's character is not as well formed as an adult's; his traits are less fixed and his actions less likely to be evidence of irretrievable depravity."

<u>Montgomery</u>, 136 SCt at 733 (quoting <u>Miller</u>, 132 SCt at 2464) (additional quotation marks omitted).

only on the worst-of-the-worst juvenile murderers, much like the Supreme Court has long directed that the death penalty may be imposed only on the worst-of-the-worst adult murderers. To the extent this Court's decisions in <u>Jones</u> and <u>Bun</u> suggested otherwise, they are hereby disapproved.

In this case, the trial court appears generally to have considered Appellant's age and perhaps some of its associated characteristics, along with the overall brutality of the crimes for which he was convicted, in sentencing him to serve life without parole for the murder of Charles Boyer – a crime for which Appellant may have been convicted only as an aider-and-abetter. The trial court did not, however, make any sort of distinct determination on the record that Appellant is irreparably corrupt or permanently incorrigible, as necessary to put him in the narrow class of juvenile murderers for whom an LWOP sentence is proportional under the Eighth Amendment as interpreted in <u>Miller</u> as refined by <u>Montgomery</u>. Whether such a determination may be made in this case is a matter that should be addressed in the first instance by the trial court on remand. Accordingly, we vacate the life without parole sentence imposed on Appellant for malice murder and remand the case for resentencing on that count in

accordance with this opinion, <u>Miller</u>, and <u>Montgomery</u>.

<u>Judgment affirmed in part and vacated in part, and case remanded for resentencing. All the Justices concur.</u>