309 Ga. 833
FINAL COPY

S20A0802.  LOVE v. THE STATE.

McMILLIAN, Justice.

Antavian Love was convicted of malice murder and other crimes in connection with the shooting death of Enrique Trejo.[1] On appeal, Love, who was 16 years old at the time the crimes were committed, asserts that the trial court erred in denying the motion to suppress his statements to law enforcement and in sentencing him as a juvenile to serve life without parole. For the reasons that

---

[1] The victim was killed on June 18, 2016. On August 15, 2016, a Newton County grand jury indicted Love for malice murder (Count 1), felony murder predicated on armed robbery and aggravated assault (Counts 2 and 3), armed robbery (Count 4), aggravated assault (Count 5), theft by receiving stolen property (Count 6), and possession of a firearm during the commission of a felony (Count 7). At a trial held from April 10 to April 13, 2017, a jury found Love guilty on all counts. After a sentencing hearing on July 21, 2017, the trial court sentenced Love to serve life in prison without the possibility of parole for malice murder (Count 1), life concurrent with Count 1 for armed robbery (Count 4), and five years consecutive for the possession of a firearm during the commission of a felony (Count 7). The felony murder counts were vacated by operation of law, and the remaining counts were merged for sentencing. Love filed a motion for new trial on August 1, 2017, which he amended in May 2018. Following a hearing, the trial court denied the motion on September 13, 2019. Love timely appealed, and the case was docketed to the April 2020 term of this Court and thereafter submitted for a decision on the briefs.

follow, we affirm.

Viewed in the light most favorable to the jury's verdict, the record shows that Trejo was the general manager at the El Charro restaurant located on Covington Bypass Road in Newton County. When he did not return home on the evening of June 18, 2016, his wife went to the restaurant looking for him. The restaurant's surveillance cameras showed Trejo locking up the restaurant, entering his vehicle, and driving away as usual around 11:30 p.m. Police also obtained surveillance video from a nearby gas station that showed Trejo pull into the parking lot and enter the store. When he exited, three individuals got into his vehicle with him.

Early on the morning of June 19, a driver reported what appeared to be a body lying on the side of Lower River Road. When officers responded, they observed broken safety glass, consistent with that from a car window, in the roadway. A trail of blood led from the broken glass to the side of the road where Trejo was lying face down in a ditch, dead from multiple gunshot wounds. Officers also located a spent .40-caliber Smith & Wesson casing on the other

side of the road. Trejo's wallet, which contained more than $450, was recovered from his back pocket. Officers were unable to locate Trejo's vehicle, a dark-colored Ford Expedition, and an all-points bulletin was issued for law enforcement to be on the lookout for the vehicle.

Around 9:00 p.m. that evening, a Covington Police Department officer observed a dark-colored Ford Expedition at an intersection and attempted to catch up with it. The vehicle continued at a high rate of speed, but the officer was eventually able to get close enough to run the tag and confirm that it was Trejo's stolen vehicle. After the officer activated his lights and sirens, the vehicle continued through a neighborhood, running through stop signs, until it reached a dead end, where the vehicle's four occupants fled on foot. The officer attempted to pursue them through the woods while directing backup. He then received a call that another officer had detained two individuals, including Love, at gunpoint on the other side of the woods.

After informing Love of his rights under *Miranda*,[2] officers

---

[2] *Miranda v. Arizona*, 384 U.S. 436 (86 SCt 1602, 16 LE2d 694) (1966).

interviewed him for just under an hour. Love confessed to shooting Trejo with a Smith & Wesson because Trejo was "talking reckless" while Love was just trying to get a ride to some "females' house" to take them to a party. A recording of the interview was played for the jury at trial. From Love's bedroom, officers collected a .40-caliber Taurus handgun and a 15-round magazine containing six .40-caliber Smith & Wesson rounds. Officers also located two .40-caliber shell casings in Trejo's vehicle. A GBI latent fingerprint examiner testified that a fingerprint taken from the magazine matched Love's fingerprint. A GBI firearms examiner testified that the shells recovered from the side of the road where Trejo was found and from Trejo's vehicle were fired from the weapon located in Love's bedroom, and the two bullets recovered from Trejo's body during the autopsy were fired from the same weapon. The medical examiner testified that Trejo had four gunshot wounds, each of which damaged major organs and each would likely have been fatal on its own.

C. M., who was 12 years old at the time of the incident, testified

that on the night of the shooting, he was sitting on the front porch of his aunt's house with his 13-year-old cousin, S. C., when Love came by three separate times to see if they wanted to go to McDonald's with him. Eventually, C. M. and his cousin agreed to walk with Love when he offered to pay for their food. When they got to the restaurant, only the drive-through was still open. They walked to a nearby gas station to ask for a ride home because Love said he did not want to walk back home on the paths. The third person they asked, whom C. M. identified as Trejo, agreed to give them a ride home. However, when they got to the street where they should have turned to go home, Love told Trejo to keep going. Then Love told Trejo to stop because he thought he lost his phone. Trejo stopped in the middle of the road, and Love got out of the car and started searching his pockets. Love then pulled out a gun and, without provocation, shot Trejo one time. Trejo turned and tried to open the driver's side door, and Love shot him in the back and then shot him again. Love ran around the front of the car and dragged Trejo to the side of the road. Love then got back in the car and drove

away, warning C. M. and S. C. not to "snitch" or he would kill them too. Love briefly stopped in a cul-de-sac to clean the shattered glass and blood out of the car. He then drove to a nearby apartment complex, removed all the papers from the vehicle, and told the boys to walk on a short path to get home. On the way, Love instructed them to take off their jackets and throw them in the bushes. S. C. corroborated this testimony.

1. Love does not dispute the legal sufficiency of the evidence supporting his convictions. Nevertheless, we have reviewed the record and conclude that, when viewed in the light most favorable to the verdict, the evidence presented at trial and summarized above was sufficient to authorize a rational jury to find Love guilty beyond a reasonable doubt of the crimes of which he was convicted. See *Jackson v. Virginia*, 443 U.S. 307, 319 (III) (B) (99 SCt 2781, 61 LE2d 560) (1979).[3]

---

[3] We remind litigants that this Court will end its practice of considering the sufficiency of the evidence sua sponte in non-death penalty cases with cases docketed to the term of court that begins in December 2020. See *Davenport v. State*, 309 Ga. 385, 399 (4) (b) (846 SE2d 83) (2020). This Court began assigning cases to the December term on August 3, 2020.

2. Love asserts that the trial court erred in denying the motion to suppress his custodial statement because he did not knowingly and voluntarily waive his right against self-incrimination. Specifically, Love argues that officers did not promptly give notice to his mother that he was being taken into custody as required by OCGA § 15-11-501 (b), he was not given a chance to contact his mother or an attorney, he was not aware of the charges on which he was being detained, and the investigators' method of questioning led him to believe they were trying to help him. We disagree.

"Even where, as here, a juvenile is involved, the question of whether there was a knowing and intelligent waiver of constitutional rights depends on the totality of the circumstances surrounding a police interrogation." *Heard v. State*, 287 Ga. 554, 556 (2) (697 SE2d 811) (2010) (citation and punctuation omitted). See also *Green v. State*, 282 Ga. 672, 675 (2) (653 SE2d 23) (2007) ("Even assuming that OCGA § [15-11-501] was violated by the failure to contact a parent or guardian, there is no automatic exclusion of a juvenile's statement if the parent is not separately advised; instead

the question of waiver [of his constitutional rights] must be analyzed under [the totality of the circumstances].”). In considering the totality of the circumstances in this context, we look to, among other factors,

> the accused's age and education; his knowledge of the charge and his constitutional rights; his ability to consult with family, friends, or an attorney; the length, method, and time of the interrogation; and whether he previously had refused to give a statement or repudiated the statement later.

*Norris v. State*, 282 Ga. 430, 431 (2) (651 SE2d 40) (2007) (citation and punctuation omitted).

Moreover, “[i]n reviewing a ruling on a motion to suppress, we review the trial court's factual findings for clear error and its legal conclusions de novo[,] . . . constru[ing] the evidentiary record in the light most favorable to the trial court's factual findings and judgment.” *White v. State*, 307 Ga. 601, 602 (2) (837 SE2d 838) (2020) (citations and punctuation omitted). In addition, we will generally limit our consideration of the disputed facts to those expressly found by the trial court. See id.

So viewed, the record shows that at the *Jackson-Denno*[4] hearing, Covington Police Officer Kenyatta Barnes testified that he was responding to the pursuing officer's call for assistance on the night of June 19, 2016, and detained Love and another juvenile as they came running through the woods after fleeing the Ford Expedition. When Love said that he was only 16 years old and asked why he was being arrested, Officer Barnes responded that Love was being detained, not arrested. After Love again stated, "I'm only 16," Officer Barnes told him to be quiet, and Love complied. According to Officer Barnes, Love did not ask to call his mother. Another officer then read a statement of *Miranda* rights for juveniles, including the right to confer with a parent or legal guardian during the investigation, before Love and the other juvenile were transported to the Newton County Sheriff's Office. The transporting officer testified that he did not converse with Love.[5] Although Love spoke

---

[4] *Jackson v. Denno*, 378 U.S. 368 (84 SCt 1774, 12 LE2d 908) (1964).

[5] The State also presented the testimony of several other officers from the Covington Police Department and Newton County Sheriff's Office who interacted with Love on the night of his arrest. Each officer testified that Love

to the other juvenile during the ride,[6] the officer could not make out their conversation, only hearing Love laugh at times.

Two Newton County Sheriff's Office investigators interviewed Love at approximately 11:15 p.m. after advising him of his rights using a form designed for juveniles that included the right to have a parent or guardian present. The interview, which lasted just under one hour, was recorded, and the recording showed that Love stated that he understood and initialed next to each right before signing the waiver-of-rights form. He did not ask for his mother to be present, nor did he invoke his rights to remain silent or to have an attorney. At the beginning of the interview, Love indicated that he thought he was there for a curfew violation, which the investigators did not initially correct. However, 16 minutes into the interview, officers told Love he was under investigation for murder and

neither made any statements nor asked for his mother to be contacted while he was detained.

[6] There is no indication in the record that the other juvenile detained with Love, later identified as Love's younger brother, was a party to the crimes committed in this case.

confronted him with evidence that he was lying about his activity over the past 24 hours. When the officers offered to help and noted that the other boys were all talking,[7] Love responded that the officers could not help him. The officers stated that was because Love knew that he was lying. Love then asked what help could be provided, and one of the officers said he would take Love's statement and "that's the only thing I can do." When the officer said that telling the truth would help, Love confessed to the murder. At the conclusion of the interview, Love asked the officers not to tell his mother. When officers responded that they had to tell her, Love responded, "Damn, she's going to be so disappointed, man."

Love also testified at the *Jackson-Denno* hearing and claimed that he asked both the initial detaining officers and the transporting officer to call his mother, and each time, he was told they would make it happen. He also claimed that while he was waiting to be escorted to the interview room, he again asked for his mother to be

---

[7] Although it is not clear from the record, it appears that the officers were referring to the other individuals who fled from the Ford Expedition.

called, but a female officer laughed at him.[8] He did not ask for his mother to be present once he got to the interview room because he had already asked so many times and thought the officers did not care. When confronted with transcripts from the recorded interview, Love testified that he did not recall telling officers not to contact his mother.

After independently reviewing the audio and video recording of Love's interview and considering the testimony offered at the *Jackson-Denno* hearing, the trial court credited the testimony of the officers over Love's and specifically found that Love was informed of the right to have a parent present but did not invoke that right. In denying the motion, the trial court also found that Love, after knowingly and intelligently waiving his rights under *Miranda*, provided his statement to law enforcement without the slightest hope of benefit or fear of injury.[9]

---

[8] One of the interviewing officers testified that there was no female officer present at the time of the interview.

[9] The trial court again rejected Love's arguments to suppress his custodial statement in its order denying Love's motion for new trial.

We discern no error in the trial court's factual findings or its legal conclusions. Although Love's mother was not present, this factor is not determinative on the issue of voluntariness. See *Allen v. State*, 283 Ga. 304, 306 (2) (a) (658 SE2d 580) (2008); *Green*, 282 Ga. at 675 (2). The recording refutes Love's claim that he asked officers to contact his mother, and the trial court was entitled to credit the testimony of multiple officers that Love did not ask for his mother before the interview began. See *Norris*, 282 Ga. at 432 (2). And the record otherwise confirms that Love, who had completed ninth grade and was able to read and write, initialed next to each of the rights that he would be waiving, including the right to have a parent present, before agreeing to an interview, which lasted less than an hour. Also, at the end of the interview, Love said that he did not want his mother notified of the charges. Nothing in the record indicates that Love previously refused to give a statement or subsequently repudiated his statement.

The trial court was also authorized to reject Love's claim that he was not aware of the charges on which he was being detained.

Love was caught fleeing on foot from Trejo's vehicle within hours after Trejo's body was found, and officers made him aware of the pending murder charge approximately 16 minutes into the interview after questioning him about his activities over the past 24 hours and before Love confessed to the murder. And at no point did the investigators make any promises or threats to induce Love to speak with them. See *Bunnell v. State*, 292 Ga. 253, 255 (2) (735 SE2d 281) (2013) (officer's statement that this was defendant's opportunity to tell his side of the story before others began telling their version of events is not an improper hope of benefit); *Wilson v. State*, 285 Ga. 224, 228 (3) (675 SE2d 11) (2009) (officer's statement "to help yourself out" was an encouragement to tell the truth and not an improper hope of benefit).

Thus, under the totality of the circumstances, we conclude that the trial court did not err in determining that Love knowingly and voluntarily waived his rights and in denying the motion to suppress. See *Allen*, 283 Ga. at 306 (2) (b) (trial court did not err in finding 16-year-old knowingly and voluntarily waived his constitutional rights

where officers informed him of those rights, including the right to have a parent or guardian present; he signed the waiver-of-rights form; although he initially asked for a parent, he did not request a parent before agreeing to the interview, which lasted approximately one hour; and he never repudiated his statement). Cf. *State v. Lee*, 298 Ga. 388, 389 (782 SE2d 249) (2016) (trial court properly concluded based on the totality of the circumstances that 15-year-old defendant did not knowingly and intelligently waive his rights where video recording showed that defendant, who was at the police station for ten hours and extremely distraught, never signed the waiver form, never expressed an understanding of his rights, and appeared to have minimal capacity to understand what little the investigators attempted to communicate regarding his rights).

3. Love also asserts that the trial court erred in sentencing him to serve life in prison without the possibility of parole because the evidence did not support a finding that Love was irreparably corrupt. We are not persuaded.

In *Miller v. Alabama*, 567 U.S. 460, 480 (II) (132 SCt 2455, 183

LE2d 407) (2012), the United States Supreme Court held that in considering whether to sentence a juvenile convicted of murder to life without parole consistent with the Eighth Amendment's prohibition against cruel and unusual punishment, the trial court must "take into account how children are different, and how those differences counsel against irrevocably sentencing them to a lifetime in prison." The Court specifically noted the following characteristics of children:

> First, children have a lack of maturity and an underdeveloped sense of responsibility, leading to recklessness, impulsivity, and heedless risk-taking. Second, children are more vulnerable to negative influences and outside pressures, including from their families and peers; they have limited control over their own environment and lack the ability to extricate themselves from horrific, crime-producing settings. And third, a child's character is not as well-formed as an adult's; his traits are less fixed and his actions less likely to be evidence of irretrievable depravity.

Id. at 471 (II) (citations and punctuation omitted). The Court subsequently explained that a sentence of life without parole "is excessive for all but the rare juvenile offender whose crime reflects irreparable corruption." *Montgomery v. Louisiana*, 577 U.S. ___, ___

(III) (136 SCt 718, 193 LE2d 599) (2016) (citation and punctuation omitted). Relying on *Miller* and *Montgomery*, this Court held in *Veal v. State*, 298 Ga. 691, 701-03 (5) (d) (784 SE2d 403) (2016), that in order to ensure that principles of proportionality are satisfied under the Eighth Amendment, a trial court must make a "distinct determination on the record" that the defendant is an "exceptionally rare" juvenile who is "irreparably corrupt" or "whose crimes reflect permanent incorrigibility" before imposing a sentence of life without parole  (citation, punctuation and emphasis omitted).[10]

Here, the State presented the following evidence in aggravation at the sentencing hearing. In September 2014, Love was adjudicated delinquent for committing aggravated battery after breaking another child's jaw and knocking him unconscious. In 2015, Love was adjudicated delinquent for committing burglary

---

[10] We have since noted that *Veal* did not specifically hold that this determination amounts to a factual finding and concluded that the State is not required to prove that the juvenile is irreparably corrupt beyond a reasonable doubt. *White*, 307 Ga. at 606-07 (3) (b) & n.7 (noting some courts have determined that *Miller* does not require trial courts to make any particular factual finding at all).

after breaking into a residence and stealing televisions, jewelry, money, and a safe. Love was also adjudicated delinquent for criminal trespass twice in 2015, once for kicking in the backdoor of an unoccupied residence and then tampering with various chemicals and kitchen equipment, and again for entering the room of a mentally impaired teenage girl in the middle of the night. Love's juvenile probation officer testified that Love was also found delinquent for interfering with an electronic monitoring device after he removed his court-ordered ankle monitor in 2015.

After confessing to the shooting in this case, Love laughed at Trejo's accent and joked that the smell of Trejo's uniform made him hungry and that "bro could take some bullets." And after he was convicted of murder, Love was involved in a jail fight in which he was the primary aggressor. When guards ordered Love to the ground, he ignored the command and continued striking his cellmate until guards subdued him with a Taser. Love's educational records revealed that he lied to a teacher about entering the girl's restroom, faked having a gun and ordered everyone to get down to

scare his classmates, struck a student with a book, backhanded another student, and struck a third student without provocation.

At the conclusion of the hearing and in its lengthy order denying Love's motion for new trial, the trial court stated that it considered the sentence in light of *Miller*, *Montgomery*, and *Veal* and recognized that children are constitutionally different from adults because of a child's diminished culpability and greater prospects for reform. The trial court also explained that it was mindful that whether a juvenile should be subject to such a sentence turns on whether he is irreparably corrupt, exhibiting such irreparable depravity that rehabilitation is impossible. The trial court then noted Love's school records showing a history of incidents involving physical violence and his juvenile record showing a criminal propensity that had accelerated, including after his conviction in this case, despite regular supervision and visits by a juvenile probation officer, community service, and family counseling with his mother.

With respect to the circumstances of the underlying crimes, the

trial court noted that the unarmed victim was only trying to help Love when Love shot him without provocation in front of 12- and 13-year-old children, whom he then threatened to kill as well. Love was not under the influence of drugs or impaired, has never been diagnosed with a mental disorder, and had no motive to kill Trejo. And when Love later described killing the victim, he was flippant and disrespectful, showing no remorse. The trial court further found Love was not acting under sudden compulsion or immaturity and that there was no outside pressure or negative influence. Rather, the evidence showed that Love orchestrated and planned the murder in an isolated location and was the sole actor. Thus, the trial court concluded that Love had shown a consistent disrespect for authority; that rehabilitation was not a realistic expectation; that Love's crimes reflect that he is permanently incorrigible and irreparably corrupt; and that as a result, Love is in the narrow class of juvenile murderers for whom a life without parole sentence is proportional under the Eighth Amendment.

We conclude that the record evidence the trial court carefully

laid out in great detail supports its determination that Love was irreparably corrupt. See *White*, 307 Ga. at 605-06 (3) (a) (holding Eighth Amendment does not demand a deviation from the ordinary rule that proof by a preponderance of the evidence is sufficient to sentence a juvenile offender to serve life without parole). And although Love notes that the trial court did not rely on any expert or medical testimony to support its determination, nothing in *Miller*, *Montgomery*, or *Veal* requires the use of an expert to aid a court in making a determination that a juvenile offender is irreparably corrupt. Accordingly, we discern no basis to vacate Love's sentence. See *White*, 307 Ga. at 606-07 (3) (b) (affirming finding that juvenile defendant was irreparably corrupt despite defense expert's conclusion otherwise where juvenile was the initiator of the murder, tried to evade responsibility, and had been reckless and impulsive throughout his childhood despite living in a normal and supportive environment).

4. Love also argues that, although Georgia law currently permits a juvenile to be sentenced to life without the possibility of

parole, this Court should nonetheless preclude such a sentence because a finding of irreparable corruption cannot be reliably made by experts, much less a trial court, and because the evolving standards of decency both in the United States and internationally weigh against imposing such a sentence.

Although the United States Supreme Court has recognized that "[i]t is difficult even for expert psychologists to differentiate between the juvenile offender whose crime reflects unfortunate yet transient immaturity, and the rare juvenile offender whose crime reflects irreparable corruption," *Graham v. Florida*, 560 U.S. 48, 73 (III) (B) (130 SCt 2011, 176 LE2d 825) (2010) (citation and punctuation omitted), and Love has pointed to certain states, foreign laws, and international treaties and customs that do not impose life without parole sentences for juveniles, the Supreme Court has nevertheless permitted courts to sentence juveniles who have committed homicide to life without parole, subject to a determination by the sentencing court that the juvenile is "irreparably corrupt." See *Montgomery*, 577 U.S. ___; *Miller*, 567

U.S. 460. We see no reason to depart from that precedent.

Moreover, although Love claims that a number of states and the District of Columbia have banned life sentences without the possibility of parole for juvenile offenders, OCGA § 16-5-1 (e) (1) permits imprisonment for life without parole upon a conviction for murder. To the extent that Love asserts that for policy reasons, life without parole sentences should not be permitted for juveniles, those types of considerations are best left to be weighed by our General Assembly. See *Bun v. State*, 296 Ga. 549, 551 (2) (769 SE2d 381) (2015) (rejecting Eighth Amendment challenges to Georgia's murder statute raised upon grounds asserted in *Miller*), overruled in part on other grounds, *Veal*, 298 Ga. at 703 (5) (d).

*Judgment affirmed. All the Justices concur, except Warren, J., not participating.*

Decided September 28, 2020.

Murder. Newton Superior Court. Before Judge Ozburn.
*Jason Kang*, for appellant.
*Layla H. Zon, District Attorney; Christopher M. Carr, Attorney General, Patricia B. Attaway Burton, Deputy Attorney General, Paula K. Smith, Senior Assistant Attorney General, Alex M. Bernick, Assistant Attorney General*, for appellee.