311 Ga. 698
FINAL COPY


S21A0377. HOLMES v. THE STATE.


PETERSON, Justice.

Dequan Holmes appeals his convictions for felony murder, aggravated assault, and two counts of possession of a firearm during the commission of a crime for the shooting death of Javares Alston and the non-fatal shooting of Danielle Willingham.[1] He argues that the evidence was insufficient to convict him and that the trial court committed plain error when it charged the jury to "consider with

---

[1] The crimes occurred on June 28, 2012. On September 25, 2012, a Richmond County grand jury indicted Holmes for malice murder, felony murder, aggravated assault, and two counts of possession of a firearm during the commission of a crime. At Holmes's trial in August 2013, a jury found Holmes not guilty of malice murder but guilty of felony murder, one count of aggravated assault, and two counts of possession of a firearm during the commission of a crime. The court sentenced him to life without parole for felony murder; twenty years of imprisonment for aggravated assault, to be served consecutively; and ten years of imprisonment for two counts of possession of a firearm during the commission of a crime, to be served consecutively. Holmes filed a motion for new trial, and following a hearing, the trial court denied his motion in an order entered on June 27, 2017. Holmes filed an untimely notice of appeal, which we dismissed. The trial court granted Holmes's motion for an out-of-time appeal, and he then filed a timely notice of appeal. His case was docketed to this Court's term beginning in December 2020 and submitted for a decision on the briefs.

great care and caution" Holmes's out-of-court statements. Holmes, who was a juvenile at the time the crime was committed, also challenges his sentence of life without parole, arguing that it violates the Eighth Amendment to the United States Constitution as interpreted by the United States Supreme Court. We hold that the evidence was sufficient to convict Holmes and that any error in the trial court's instruction to the jury did not amount to plain error because the instruction did not affect the outcome of his trial. We also conclude that Holmes's sentence of life without parole was not prohibited by United States Supreme Court precedent, especially in the light of that Court's recent decision in *Jones v. Mississippi*, ____ U.S. ___ (141 SCt 1307, 209 LE2d 390) (2021). We therefore affirm.

The evidence presented at trial showed the following. According to Willingham, he and Alston shared a mobile home as roommates. Sometime after 2:00 a.m. on June 28, 2012, Willingham was awakened by loud knocking on the front door. Peeking out, he saw by the light of a porch lamp a person whom he later identified as Holmes, standing outside the door and saying, "I got your money.

I was just playing." Willingham knew that Holmes and Alston socialized, but he had never been introduced to Holmes. Willingham went to Alston's bedroom and relayed what Holmes said. Alston told Willingham that he had been robbed recently. Alston went to the door and opened it, with Willingham standing behind him. Holmes again said, "I got your money. I was just playing." But Holmes then pulled a gun out of his pocket and began shooting. Willingham was shot in his thigh while running for cover but managed to hide in the bathroom; Alston tried to run but collapsed in the hallway after Holmes shot him three times. Holmes continued to shoot until the gun was empty and then left. Willingham testified that neither he nor Alston had a knife or any other weapon when they opened the door. He also said that he did not confront Holmes and did not believe that Alston did either, nor did he hear any scuffle after Holmes pulled out the gun.

Willingham called 911 after finding Alston face down on the floor and unresponsive. Paramedics attempted to resuscitate Alston, but he was pronounced dead on the scene. The police did not find

any weapons on Willingham or near Alston's body at the time. An autopsy confirmed that Alston died of his gunshot wounds.

After leaving the scene, Holmes called a close friend, Eugene Butler, to pick him up at the mobile home park, telling Butler that he had "messed up" and "got him one." Butler's girlfriend, Princess Brown, drove Butler to meet Holmes at the mobile home park. Holmes told Brown and Butler that some "work" was stolen from him and two people owed him money, he was heated about it, he went to their door to collect the money, and when they refused to pay, he shot them. He told Butler that he shot one person in the head or chest and killed him, but the second person did not die. Holmes appeared nervous and scared, saying "I messed up," "I don't know what I did," "I lost my mind," and "I got me one." He also laughed and said that he was "crazy" and "that's what they get."

Holmes testified at trial. He said that he regularly sold drugs to people in the mobile home park, including Alston and Willingham, that he had sold crack cocaine to other customers the day before the shooting, and that he went to the mobile home on the night of the

4

shooting with crack cocaine in his pocket to sell "drugs" to Alston at Alston's request. Holmes claimed that Alston opened the door and invited him in but then pulled a knife on him as he was entering, saying, "give me that 'S' before I kill you." Holmes told Alston "all right," but when Alston reached up, Holmes grabbed his pistol and shot Alston while Holmes was running out of the mobile home. Holmes admitted on cross-examination that he lied when giving statements to the police after the shooting. The State later introduced recordings of Holmes's four police interviews. During the first three interviews, Holmes denied shooting Alston, but he admitted doing so, in self-defense, during the final interview. And not once during his four interviews did he mention selling drugs to Alston; instead, he told the police that Alston owed him money and told him to come at 2:00 a.m. to collect it.

1.    Holmes argues that the evidence was insufficient to support his convictions because the State failed to disprove beyond a reasonable doubt that he acted in self-defense. We disagree.

When evaluating the sufficiency of evidence as a matter of

federal due process under the Fourteenth Amendment to the United States Constitution, the proper standard of review is whether a rational trier of fact could have found the defendant guilty beyond a reasonable doubt. See *Jackson v. Virginia*, 443 U.S. 307, 319 (99 SCt 2781, 61 LE2d 560) (1979). This Court views the evidence in the "light most favorable to the verdict, with deference to the jury's assessment of the weight and credibility of the evidence." *Hayes v. State*, 292 Ga. 506, 506 (739 SE2d 313) (2013) (citation and punctuation omitted).

In his trial testimony, Holmes admitted that he shot Alston and Willingham but claimed that he shot them in self-defense. But the jury could have rejected Holmes's claim that he was acting in self-defense. See *Mims v. State*, 310 Ga. 853, 855 (854 SE2d 742) (2021) ("[T]he defendant's testimony, in which he claimed he was justified or provoked into acting, may itself be considered substantive evidence of guilt when disbelieved by the jury, as long as some corroborative evidence exists for the charged offense." (citation omitted)); see also *Shaw v. State*, 292 Ga. 871, 872 (1) (742

SE2d 707) (2013) ("[I]ssues of witness credibility and justification are for the jury to decide, and the jury is free to reject a defendant's claim that he acted in self-defense." (citation and punctuation omitted)). Here, there was both corroborative and direct evidence that Holmes shot Alston, and not in self-defense. Willingham testified that he and Alston were unarmed when they opened the door for Holmes; the police found no weapons on Alston or Willingham or at their mobile home; Brown and Butler informed the police that Holmes told them he shot the victims because they refused to pay him; and Holmes's credibility as a witness was undermined by his in-court admission that he lied to the police and his assertions of innocence in prior police interviews.

2. Holmes contends that the trial court committed plain error in charging the jury to "consider with great care and caution" his out-of-court statements. We disagree.

The relevant part of the challenged jury charge was as follows:

You should consider with great care and caution the evidence of any out-of-court statement allegedly made by the Defendant offered by the State. The jury may believe

7

any such statement in whole or in part, believing that which you find to be true and rejecting that which you find to be untrue. You alone have the right to apply the general rules of testing the believability of witnesses and to decide what weight should be given to all or part of such evidence.

Holmes argues that this pattern charge violated his right to due process because the trial court did not clarify that the jury's duty to consider his statements with "great care and caution" applied only to incriminatory statements. Without such a limitation, Holmes argues, the jury was effectively told that it should apply a heightened level of scrutiny to Holmes's exculpatory statements and his trial testimony. Holmes claims that the charge relieved the State of its duty to prove all elements of the charged crimes beyond a reasonable doubt because his trial testimony was the only evidence of his sole defense (self-defense) and the trial court did not instruct jurors to consider conflicting statements of other witnesses with the same scrutiny.

Holmes did not object to the charge at trial, so we review this claim only for plain error. See OCGA § 17-8-58 (b) (failure to object

to a jury charge "shall preclude appellate review of such portion of the jury charge, unless such portion of the jury charge constitutes plain error which affects substantial rights of the parties"). To establish plain error, Holmes "must point to an error that was not affirmatively waived, the error must have been clear and not open to reasonable dispute, the error must have affected his substantial rights, and the error must have seriously affected the fairness, integrity, or public reputation of judicial proceedings." *Denson v. State*, 307 Ga. 545, 547-548 (2) (837 SE2d 261) (2019) (citation and punctuation omitted). To show that an error affected his substantial rights, Holmes must make an "affirmative showing that the error probably did affect the outcome below." *McKinney v. State*, 307 Ga. 129, 135 (2) (b) (834 SE2d 741) (2019) (citation and punctuation omitted). If Holmes fails to meet any one of the elements of the plain error test, his claim fails. See *Denson*, 307 Ga. at 548 (2).

Even assuming that Holmes could meet the other elements of the plain error test, Holmes cannot show that the complained-of charge constituted clear error. Considering the instructions in

9

context, see *Campbell v. State*, 292 Ga. 766, 769 (3) (740 SE2d 115) (2013), a reasonable jury would not have understood the instruction to mean that it should be more skeptical of Holmes's testimony and exculpatory statements than testimony of other witnesses. The charge referred only to the *State's* use of Holmes's *out-of-court* statements, which were mostly incriminatory, not to Holmes's use of those statements or his own testimony. In fact, the court instructed the jury in a previous charge that it should evaluate Holmes's in-court testimony "as you would that of any other witness." And because the charge was given immediately after instructions about evaluating whether the defendant's custodial statements were made voluntarily and with full knowledge of his constitutional rights, a reasonable jury would likely have understood the charge to encourage skepticism only of Holmes's custodial statements. See *Williamson v. State*, 305 Ga. 889, 896 (3) (b) (827 SE2d 857) (2019).

3. Holmes was four days shy of his eighteenth birthday when he shot Alston and Willingham. He argues that his sentence of life

without parole ("LWOP") for the murder of Alston violated the Eighth Amendment to the United States Constitution because the trial court failed to consider explicitly the characteristics of minors and failed to make a distinct determination on the record that he was irreparably corrupt. Holmes's Eighth Amendment claim fails, because the United States Supreme Court has recently made clear that the Eighth Amendment does not require sentencing judges to say anything on the record on these points, and there is nothing in the record here showing that the trial court did not consider the relevant factors.

At Holmes's sentencing hearing, the State introduced evidence of Holmes's previous criminal activity as a juvenile, including attempted strong-arm robbery and third-degree burglary in South Carolina. Holmes's grandmother testified that Holmes was "raised in church" and "knew right from wrong" and that his family talked to him often "about not being in trouble." Holmes's trial counsel argued that an LWOP sentence was excessive given Holmes's age, and that Holmes had a possibility of redemption and rehabilitation

11

because he was only 15 during the South Carolina incident and 17 when he shot Alston and Willingham.

When announcing Holmes's sentence, the trial judge stated:

> Quite frankly, I've never given a life without parole and I've had it requested many times. And I feel it is only deserving in those cases that are so severe that the Court doesn't feel there's any redeeming part to an individual. This case was so calculated and so senseless and followed so quickly after the attempted strong-arm robbery and the burglary in South Carolina, I feel that a sentence in this case is appropriate for life without parole . . . . I regret it, but I feel I have to do it.

The 2013 sentencing hearing was held after the United States Supreme Court's 2012 decision in *Miller v. Alabama*, 567 U.S. 460 (132 SCt 2455, 183 LE2d 407) (2012). The trial judge did not explicitly mention Holmes's age or discuss the characteristics of youth during sentencing. In his order denying Holmes's motion for new trial, however, the judge stated that Holmes's sentence complied with *Miller* because "the Defendant's age and juvenile status [were] considered during the sentencing hearing."

In *Miller*, the United States Supreme Court held that a sentencing scheme mandating LWOP for those under the age of 18

at the time of their crimes violated the Eighth Amendment's prohibition on cruel and unusual punishment. See 567 U.S. at 465, 479. Four years later, the Supreme Court held in *Montgomery v. Louisiana*, 577 U.S. 190 (136 SCt 718, 193 LE2d 599) (2016), that *Miller* had announced a substantive rule of constitutional law that must be given retroactive effect in state collateral review proceedings. See id. at 212. In so doing, the Supreme Court said that "the sentencing judge [must] take into account how children are different, and how those differences counsel against irrevocably sentencing them to a lifetime in prison" before sentencing a juvenile offender to LWOP; and that "[e]ven if a court considers a child's age before sentencing him or her to a lifetime in prison, that sentence still violates the Eighth Amendment for a child whose crime reflects unfortunate yet transient immaturity." Id. at 208 (citation and punctuation omitted). And *Montgomery* emphasized that an LWOP sentence is permitted only in "exceptional circumstances": for "the rare juvenile offender who exhibits such irretrievable depravity that rehabilitation is impossible," those "rarest of juvenile

13

offenders . . . whose crimes reflect permanent incorrigibility," and "those rare children whose crimes reflect irreparable corruption" — and that an LWOP sentence is not permitted for "the vast majority of juvenile offenders." Id. at 208-213.

Based on this language in *Montgomery*, we held in *Veal v. State*, 298 Ga. 691 (784 SE2d 403) (2016), that it was not enough for a sentencing court merely to consider generally a juvenile offender's age and associated characteristics. See id. at 703 (5) (d). Rather, we said that to place a defendant "in the narrow class of juvenile murderers for whom an LWOP sentence is proportional under the Eighth Amendment as interpreted in *Miller* as refined by *Montgomery*[,]" a sentencing court must make a "distinct determination on the record" that the defendant "is irreparably corrupt or permanently incorrigible[.]" *Veal*, 298 Ga. at 703 (5) (d). Furthermore, we stated in a footnote that it is "important" that a sentencing court "explicitly consider" the primary ways that characteristics of children are relevant to sentencing. Id. at 702 (5) (d) n.6. Our holding in *Veal* was explicitly a holding of federal

constitutional law based on our understanding of the decisions of the United States Supreme Court in *Miller* and *Montgomery*. In subsequent cases, we declined to extend *Veal* to hold that the determination of irreparable corruption it required is a factual finding — let alone a finding that must be made by a jury, or beyond a reasonable doubt. See *Raines v. State*, 309 Ga. 258, 268 (2) (c) (845 SE2d 613) (2020); *White v. State*, 307 Ga. 601, 605-606 (3) (a) (837 SE2d 838) (2020).

Earlier this year, the United States Supreme Court decided *Jones*, which confirmed that we were right not to extend *Veal* and, indeed, held that in *Veal* we read *Miller* and — especially — *Montgomery* too broadly. In *Jones*, the Court considered a defendant's claim that the sentencing court erred by imposing LWOP sentences for crimes that the defendant had committed as a minor, because the sentencing court failed to make a factual finding of permanent incorrigibility or, at the very least, an on-the-record explanation of the sentence containing an "implicit finding" of permanent incorrigibility. 141 SCt at 1313. But the United States

15

Supreme Court upheld the sentence, holding that *Miller* does not require a separate factual finding of permanent incorrigibility before a sentencer imposes an LWOP sentence on a murderer under age 18. See *Jones*, 141 SCt at 1314-1319. And the Court rejected Jones's alternative argument that a sentencer must at least make an on-the-record explanation for the sentence that carried an "implicit finding" of permanent incorrigibility, saying that an on-the-record finding is (1) not necessary to ensure that a sentencer considers a defendant's youth, (2) not required by or consistent with *Miller* or the Court's analogous death penalty precedents, and (3) not dictated by any consistent historical or contemporary sentencing practice in the States. See id. at 1319-1321. In particular, the Court explained, "if the sentencer has discretion to consider the defendant's youth [as *Miller* requires] . . . it would be all but impossible for a sentencer to avoid considering that mitigating factor," especially where defense counsel makes arguments focused on the offender's youth. Id. at 1319.

In short, *Jones* clarified that although the Eighth Amendment

requires that, before sentencing a juvenile murderer to LWOP, a trial court must hold a sentencing hearing where the defendant's age and characteristics of children are *considered*, neither *Miller* nor *Montgomery* requires a sentencer to say anything on the record about youth and its attendant characteristics before imposing an LWOP sentence. Therefore, to the extent that *Veal* suggested a requirement that sentencers provide explicit, on-the-record explanations regarding determinations of permanent incorrigibility and the characteristics of children, *Jones* has explained that we were mistaken.

Holmes's challenge to his sentence thus cannot succeed. Holmes argues that his sentence is void because the trial court did not make a "distinct determination on the record" that Holmes was "irreparably corrupt or permanently incorrigible." *Veal*, 298 Ga. at 703 (5) (d). But *Jones* makes it clear that no such determination need be made on the record. See 141 SCt at 1312-1313, 1320.

Holmes also argues that the trial court failed sufficiently to consider "youth and its attendant characteristics" as factors at

Holmes's sentencing hearing. But, under *Jones*, "unless the record affirmatively reflects otherwise, the trial court will be deemed to have considered the relevant criteria, such as mitigating circumstances, enumerated in the sentencing rules." Id. at 1321 (noting that appellate courts do not necessarily reverse a sentence "merely because the sentencer could have said more about mitigating circumstances" (citation and punctuation omitted)); see also *State v. Abbott*, 309 Ga. 715, 719 (2) (848 SE2d 105) (2020) ("Trial judges too are presumed to know the law and apply it in making their decisions, absent some indication in the record suggesting otherwise." (citation, punctuation and emphasis omitted)). Here, the trial judge, like the sentencer in *Jones*, had discretion to sentence Holmes to a lesser sentence than LWOP. The record does not show that the trial court failed to consider the required factors; rather, the record shows that the trial court did consider them. Holmes's trial counsel made arguments focused on Holmes's youth and possibility for rehabilitation. The trial judge heard evidence about Holmes's childhood environment. All of this

happened after the Supreme Court decided *Miller*, so we presume the trial court knew and applied its holding. And in denying Holmes's motion for new trial, the trial judge stated that he considered Holmes's age and juvenile status during the sentencing hearing. Accordingly, we conclude that the trial judge sufficiently considered the required factors in sentencing Holmes to LWOP.

*Judgment affirmed. All the Justices concur.*

Decided June 1, 2021.

Murder. Richmond Superior Court. Before Judge Blanchard.

*Patrick G. Sellars, Katherine M. Mason, Lucy D. Roth,* for appellant.

*Natalie S. Paine, District Attorney, Joshua B. Smith, Assistant District Attorney; Christopher M. Carr, Attorney General, Patricia B. Attaway Burton, Deputy Attorney General, Paula K. Smith, Senior Assistant Attorney General, Michael A. Oldham, Assistant Attorney General*, for appellee.