320 Ga. 754
FINAL COPY

S25A0042. GARCIA-SOLIS v. THE STATE.

LaGrua, Justice.

Appellant Hector Garcia-Solis appeals his convictions for malice murder and other crimes connected to the shooting death of Hall County Deputy Sheriff Blane Dixon on July 7, 2019.[1] On

---

[1] On August 19, 2019, a Hall County grand jury indicted Garcia-Solis, Brayan Cruz, Eric Velazquez, and London Clements—individually and as parties concerned in the commission of a crime—for the following counts: malice murder (Count 1 — Garcia-Solis, Cruz, Velazquez, and Clements); felony murder predicated on aggravated assault on a peace officer (Count 2 — Garcia-Solis, Cruz, Velazquez, and Clements); felony murder predicated on conspiracy to commit robbery and burglary (Count 3 — Garcia-Solis, Cruz, Velazquez, and Clements); aggravated assault on a peace officer (Count 4 — Garcia-Solis, Cruz, Velazquez, and Clements); conspiracy to commit robbery and burglary (Count 5 — Garcia-Solis, Cruz, Velazquez, and Clements); burglary in the second degree (Counts 7, 8, 9, 10, 11, and 14 — Garcia-Solis and Velazquez); entering an automobile (Count 12 — Garcia-Solis and Velazquez); criminal attempt to commit burglary, second degree (Count 13 — Garcia-Solis and Velazquez); and theft by receiving stolen property (Count 15 — Garcia-Solis).

Cruz entered a guilty plea to Counts 4 and 5 and testified for the State at trial. Garcia-Solis, Velazquez, and Clements were jointly tried from June 21 to July 8, 2021. The jury found Garcia-Solis guilty on all counts. The trial court sentenced Garcia-Solis to life in prison without the possibility of parole on the malice murder count (Count 1), plus a total of 35 consecutive years to serve for Counts 5 and 7-15. The trial court merged the aggravated assault count (Count 4) and purported to merge the felony murder counts (Counts 2 and 3) into the malice murder conviction (Count 1), but the felony murder verdicts were actually "vacated by operation of law." *Graves v. State*, 298 Ga. 551, 556 (4)

appeal, Garcia-Solis contends that: (1) the evidence was insufficient to support his conviction for malice murder; (2) the trial court erred by denying his motion for change of venue; and (3) the trial court erred in sentencing him to life without parole because, among other claims, he was 17 years old at the time the underlying crimes were committed. For the reasons that follow, we affirm Garcia-Solis's convictions and sentences in this case.

(a)    *The July 6 burglaries and initial investigation*

The evidence presented at trial showed that, on the morning of July 2, 2019, two residents of Hall County discovered that their vehicles — a 2009 red Dodge Caliber and a 2002 silver Toyota Avalon — had been stolen overnight, and they reported the thefts to law enforcement. A few days later, during the early morning hours of July 6, several break-ins occurred at automobile dealerships and

_____

(783 SE2d 891) (2016). "This error in nomenclature was harmless, however, because" Garcia-Solis "was not convicted of or sentenced for the felony murder counts." *Worthen v. State*, 304 Ga. 862, 865 (2) (823 SE2d 291) (2019).

Garcia-Solis filed a timely motion for new trial, which he amended through new counsel. After holding an evidentiary hearing on the motion for new trial, the trial court denied the motion on November 4, 2022. Garcia-Solis filed a timely notice of appeal to this Court, and the case was docketed to the term beginning in December 2024 and submitted for a decision on the briefs.

pawnshops in the Hall County area. Because most of the pawnshops were equipped with security systems to monitor after-hours activity, the burglaries and attempted burglaries at the pawnshops — namely, Swap and Trade Pawn, Foxhole Guns and Archery, and Double Deuce Pawn and Gun — were the first incidents to be reported to law enforcement. Based on surveillance videos from the pawnshops, law enforcement officers were able to establish that, between 3:15 a.m. and 5:20 a.m. on July 6, two suspects — each carrying firearms and wearing dark clothing, a mask, and gloves — broke into or attempted to break into the pawnshops.[2] The surveillance videos also established that the suspects gained entry to at least one of the pawnshops by attaching a strap to the front doors of the shop, connecting it to the tailgate of a pickup truck, and pulling the truck forward to force open the doors. Two crossbows were stolen from Swap and Trade Pawn and 23 firearms —

---

[2] The owner of Foxhole Guns and Archery testified that, because he had installed steel roll down doors and bars on the exterior of the building, the suspects attempting to break into the pawnshop were unable to gain access inside.

including handguns, rifles, and revolvers — and ammunition were stolen from Double Deuce Pawn and Gun.[3]

While investigating the pawnshop burglaries on the morning of July 6, law enforcement officers learned that several automobile dealerships had also been broken into overnight, including Los Plebes Auto Sales, Texano Auto Sales, Texas Trucks and Autos, and Eddie's Auto Sales.[4] Francisco Cuella, the owner of Los Plebes Auto Sales, testified that, when he arrived at the dealership around 9:00 a.m. on July 6, he realized that five pickup trucks had been stolen from his lot, including a 2015 Dodge Ram 2500, which law enforcement officers later established was the pickup truck used in the burglary at Swap and Trade Pawn. Cuella testified that one of the other stolen pickup trucks was discovered later that morning in a nearby neighborhood.[5] According to Cuella and law enforcement

---

[3] The owner of Swap and Trade Pawn testified that he also sold guns at his pawnshop, but "they [we]re all locked in safes" and thus were inaccessible.

[4] The owners of Texas Trucks and Autos and Eddie's Auto Sales testified that, although their businesses were burglarized and some of their property was damaged, nothing was stolen from their dealerships.

[5] The remaining pickup trucks were located by law enforcement officers throughout the day.

officers investigating the thefts, a doorbell camera installed on the exterior of one of the houses in this neighborhood captured video of the stolen pickup truck driving into the neighborhood, followed by a red Dodge Caliber. The video recordings also showed two men "jump out of the truck to get in a red Caliber." Based on surveillance video from Los Plebes, law enforcement officers were able to establish that the dealership was broken into around 1:23 a.m. on July 6, that the suspects were wearing dark clothing, face masks, and gloves, and that at least one of the suspects was armed with a handgun.

Celia Hernandez, the office manager for Texano Auto Sales, testified that Texano was also burglarized during the early morning hours of July 6. Based on surveillance video from Texano, law enforcement officers determined that two suspects — armed with handguns and wearing dark clothing, masks, and gloves — broke into the dealership's office, at which point, one of the suspects started going through files inside the office. When Hernandez examined the office after the burglary, she noticed that a file had been dropped on the floor that related to "an incident with [Garcia-

5

Solis] in [their] business." Hernandez testified that, in 2018, Garcia-Solis broke into a pickup truck located at the dealership — an incident for which Garcia-Solis was later charged — and Hernandez kept a file on the incident. Hernandez advised law enforcement officers investigating the July 6 burglary that Garcia-Solis might be involved because she discovered this file on the floor and because she noted in the video recording "the interest [the man] took in reading [the file]." According to Hernandez, no cars were stolen from the dealership during the July 6 burglary because the exit was blocked with other cars.

Holly Lester, a DeKalb County crime scene investigator who resided in Hall County at the time, testified that, between the late-night hours of July 5 and early morning hours of July 6, "crime scene investigative tools" and "various police equipment" — including a radio, gun belt, flashlight, bulletproof vest, and baton — were stolen from her county-owned van, which was parked in front of her residence. At trial, Lester reviewed images taken from the surveillance video at Double Deuce Pawn and Gun capturing the

6

burglary on July 6, and she confirmed that a bulletproof vest worn by one of the suspects in the video and the baton he was carrying appeared to be "consistent with" the vest and baton "missing out of [her] van."

After compiling and reviewing the surveillance videos from the impacted dealerships and pawnshops, law enforcement officers were able to establish that the same suspects likely committed all the burglaries, as they were wearing "the same masks and clothing in all of the thefts."

Antony Macias — a friend of the co-defendants — testified at trial that, on the morning of July 6, he was watching the news when he heard that several automobile dealerships and pawnshops had been burglarized the night before. A few hours later, Macias's friend "Adrian"[6] contacted him to ask if Garcia-Solis and Velazquez could come shoot guns at Macias's uncle's ranch in Hall County, where Macias was staying. Not long afterward, Garcia-Solis, Velazquez, and Adrian "pulled up" to the ranch in a "red Dodge car." When

---

[6] Macias testified that he did not know Adrian's last name.

Garcia-Solis and Velazquez arrived at the ranch, they told Macias that "they had some stolen guns" and asked to shoot them at the ranch. Macias testified that Garcia-Solis and Velazquez opened the trunk of the Dodge, and there were "two handguns and a shotgun" inside. One of the handguns was a gray .45-caliber that "had a little like skull" or "helmet" on it, and the other was a 9-millimeter handgun. Macias testified that Garcia-Solis, Velazquez, and Adrian stayed at the ranch shooting until about 1:30 or 2:00 p.m., and during that time, Garcia-Solis was shooting the .45-caliber handgun with the "helmet" on it.

Cruz testified that, on the night of July 6, he and his friend Jiovanny Castillo went to Adrian's house, and they saw Garcia-Solis and Velazquez, who each had a gun. Cruz observed that Garcia-Solis was also wearing a bulletproof vest. Garcia-Solis and Velazquez told Cruz and Castillo that "they robbed a pawnshop" and "they got a truck and tied it on the door and started getting guns." Cruz and Castillo testified that, around 10:00 p.m., Garcia-Solis gave Cruz, Castillo, and Velazquez a ride in a "four-door," red Dodge, which

8

Garcia-Solis told them was stolen, and Garcia-Solis drove the group to a thrift store and parked behind it. Garcia-Solis gave Cruz the key to the Dodge, and they walked home.

(b) *The July 7 police chase, shootings, and subsequent investigation*

On the afternoon of July 7, Investigator Jeremy Grindle with the Hall County Sheriff's Department discovered the stolen red Dodge Caliber and silver Toyota Avalon parked behind the thrift store. Investigator Grindle testified that, because they "believed that the red Dodge Caliber was involved in" the burglaries, Investigator Grindle and other law enforcement officers went through the process of affixing tracking devices "to the bottom of the frame of the car[s]" to "emit[ ] a GPS signal" that law enforcement officers could monitor in the event the vehicles started moving.

According to Cruz, around 6:00 p.m. on July 7, he and Clements went to Castillo's house, and Clements started communicating "through Snapchat" with Velazquez about "hit[ting] a lick at the pawn store" to "steal the guns and sell them." Castillo testified that

9

he understood the group was planning "to go and hit [ ] pawnshops" that night in a "[s]tolo" — another term for a "stolen vehicle" — but he did not join them. Cruz and Clements secured a ride to Velazquez's house with a friend, and when they arrived, Garcia-Solis was already there and discussed "hitting a lick" and how they needed to wear masks and gloves to ensure they did not leave their "fingerprints or DNA on the stolen vehicle" or anywhere else.

Around 10:00 p.m., Garcia-Solis, Cruz, Velazquez, and Clements arrived at the thrift store where the stolen cars were parked. The group "gear[ed] up" by "putting on gloves, masks, [and] getting ready," and Cruz testified that Garcia-Solis and Velazquez also had handguns with them. According to Cruz, the group "hopped in [the] gray Toyota," and Velazquez started driving. Cruz testified that, as soon as they turned out of the thrift store and started driving up the street, a law enforcement officer pulled up behind them and "start[ed] flashing his lights." Cruz testified that Garcia-Solis and Clements told Velazquez to keep driving, and Velazquez started "hitting . . . mailboxes" and eventually ran into a telephone

pole. According to Cruz, after the crash, "[they] all ran," and Garcia-Solis and Velazquez were armed at the time. Surveillance video from a nearby laundromat confirmed that the defendants fled the crash site together.

Cruz testified that Deputy Dixon was running after them, and at that point, Cruz ran and hid under a shed behind one of the houses. While Cruz was under the shed, he "heard the officer give [Garcia-Solis] instructions like put your hands up, put your hands up." Cruz testified that "[i]t got quiet for a few seconds," and then, he heard gunshots.

One of the law enforcement officers involved in the chase, Sergeant Charles Hewell, testified that he and Deputy Dixon were keeping a watch on the stolen vehicles that night, and as soon as the Toyota Avalon started to move away from the thrift store, he advised Deputy Dixon to follow it. Minutes later, Deputy Dixon alerted Sergeant Hewell that he was behind the Toyota Avalon. According to Sergeant Hewell, the Toyota ultimately crashed into a telephone pole, and when he reached the crash site, Sergeant Hewell saw

11

Deputy Dixon and the suspects running from the site of the crash. Sergeant Hewell then "exited [his] vehicle and gave chase behind them."

Sergeant Hewell started following the suspects into the adjacent neighborhood, and as he was running through the area, he heard Deputy Dixon yell, "Hey, Sarge, I have one." Sergeant Hewell testified that he ran towards Deputy Dixon's voice and overheard Deputy Dixon give the suspect commands. As Sergeant Hewell got closer, he heard "shots fired from the suspect." Sergeant Hewell then heard Deputy Dixon say, "I'm hit."

The video recordings from Deputy Dixon's body camera, which were admitted into evidence through the testimony of GBI Special Agent Jamie Abercrombie at trial, showed that Garcia-Solis was standing at the corner of a house when Deputy Dixon made physical contact with him and that Garcia-Solis had something in his hand. Agent Abercrombie testified that the video recording also reflected that Deputy Dixon gave Garcia-Solis commands to show his hands, but Garcia-Solis did not follow the commands and walked behind

12

the house. According to Agent Abercrombie, the video recording then showed a "muzzle flash from [Garcia-Solis's] gun as he t[ook] the first shot at Deputy Dixon." The first shot was "followed by four more" shots. Deputy Dixon then moved up to the porch of the house, and "two additional shots [we]re fired before Deputy Dixon beg[an] to return fire himself."[7]

According to Sergeant Hewell, when he got to the house where Deputy Dixon had been shot, "the suspect was not there," so Sergeant Hewell "began to run as fast as [he] could" to try and locate the suspect. As Sergeant Hewell was running, he came "face to face" with Garcia-Solis, who ran "away from [him] across the street." Sergeant Hewell gave Garcia-Solis commands to "show [his] hands [and] stop moving," but Garcia-Solis did not comply. Sergeant Hewell started shooting at Garcia-Solis and eventually "saw him fall." Sergeant Hewell then called for a medical unit, and Garcia-Solis was transported to the hospital. Garcia-Solis received a

---

[7] One of the shots fired from Garcia-Solis's weapon struck Deputy Dixon below his bulletproof vest.

gunshot wound to the head near his left eye and survived. Deputy Dixon was shot once in the abdomen below his bulletproof vest. He was also transported to the hospital by law enforcement officers, where — as the medical examiner confirmed at trial — he died from the gunshot wound to his abdomen.

In the early morning hours of July 8, GBI agents arrived at the crime scene and discovered shell casings on the porch of a house from Deputy Dixon's service revolver, as well as 9-millimeter shell casings, a .45-caliber shell casing, a 1911 Sig Sauer .45-caliber handgun, a key to a Dodge Caliber, and shell casings from Sergeant Hewell's service revolver. The GBI firearms examiner testified that the .45-caliber Sig Sauer recovered at the scene had a helmet on the handle, and when she examined the fatal bullet removed from Deputy Dixon's body during his autopsy, she established that the bullet was fired from this weapon. Law enforcement officers also confirmed that the .45-caliber Sig Sauer was stolen from Double Deuce Pawn and Gun on July 6.

At trial, one of Garcia-Solis's trauma nurses testified that,

14

while Garcia-Solis was in the hospital being treated for his gunshot wound, he talked to her about the events leading up to the death of Deputy Dixon on July 7. Garcia-Solis explained that his group was planning on "hitting a lick" that night, but after the car chase began, the group's plan had been to leave one guy to shoot, while all the others ran. He then told her that he was the one who stayed and shot Deputy Dixon.

Garcia-Solis also testified at trial and admitted to the following: (1) he was one of the individuals who appeared in the surveillance videos presented at trial of the automobile dealership and pawnshop burglaries committed on July 6; (2) he was responsible for stealing weapons and other items during the burglaries; (3) he was armed during the burglaries; (4) Velazquez was with him during the burglaries; (5) Clements, Cruz, and Velazquez were with him on the night of July 7, and they planned to "hit a lick"; (6) he shot and killed Deputy Dixon; and (7) he committed a prior burglary at Texano Auto Sales in 2018.

1. Garcia-Solis contends that the evidence was insufficient to

15

sustain his conviction for malice murder because no evidence was presented at trial to show any express or implied malice on his part in causing the death of Deputy Dixon. We disagree.

> When assessing a challenge to the sufficiency of the evidence as a matter of constitutional due process, the evidence presented at trial is viewed in the light most favorable to the verdicts to determine whether any rational trier of fact could have found the defendant guilty beyond a reasonable doubt of all the crimes of which he was convicted. In making this determination, we do not evaluate witness credibility, resolve inconsistencies in the evidence, or assess the weight of the evidence; these tasks are left to the sole discretion of the jury. The jury's verdicts will be upheld as long as some competent evidence, even if contradicted, supports each fact necessary to make out the State's case.

*Ridley v. State*, 315 Ga. 452, 455 (2) (883 SE2d 357) (2023) (citation omitted) (citing *Jones v. State*, 304 Ga. 594, 598 (2) (820 SE2d 696) (2018)). See also *Jackson v. Virginia*, 443 U. S. 307, 319 (III) (B) (99 SCt 2781, 61 LE2d 560) (1979). Applying that standard here and viewing the evidence in the light most favorable to the verdict, the evidence was sufficient as a matter of constitutional due process to support Garcia-Solis's conviction for malice murder.

"A person commits the offense of murder when he unlawfully

16

and with malice aforethought, either express or implied, causes the death of another human being." OCGA § 16-5-1 (a). "Express malice is that deliberate intention unlawfully to take the life of another human being which is manifested by external circumstances capable of proof. Malice shall be implied where no considerable provocation appears and where all the circumstances of the killing show an abandoned and malignant heart." OCGA § 16-5-1 (b).

> For a malice murder conviction, the requisite criminal intent is that of malice, which incorporates the intent to kill. The malice necessary to establish malice murder *may be formed in an instant*, as long as it is present at the time of the killing. Whether a killing was intentional and malicious is for the jury to determine.

*Scoggins v. State*, 317 Ga. 832, 836 (1) (a) (896 SE2d 476) (2023) (citation omitted; emphasis supplied) (citing *Benton v. State*, 305 Ga. 242, 244 (1) (a) (824 SE2d 322) (2019)).

In this case, the evidence established that, after committing a series of burglaries in which ammunition and a large number of firearms were stolen, Garcia-Solis armed himself and traveled in a stolen vehicle with his co-defendants to continue "hit[ting] licks."

17

When law enforcement officers intercepted and attempted to stop the stolen vehicle — resulting in a car crash — Garcia-Solis and his co-defendants fled into an adjacent neighborhood, where Garcia-Solis encountered Deputy Dixon. Garcia-Solis ignored Deputy Dixon's explicit commands to show his hands and took "the first shot at Deputy Dixon," followed by six more shots, before Deputy Dixon was even able "to return fire."

Additionally, at trial, one of Garcia-Solis's treating nurses testified that, while Garcia-Solis was in the hospital, he divulged his group's plan to drive around in a stolen vehicle on the night of July 7 to "hit[ ] a lick," and he confided that, after the car chase began, they planned to leave one guy to shoot, while the others ran away. Garcia-Solis told the nurse that he was the one who stayed behind and shot Deputy Dixon. Garcia-Solis also admitted at trial that he committed the crimes leading up to the car chase and crash, and he shot and killed Deputy Dixon.

In short, Garcia-Solis's admission that he intentionally shot Deputy Dixon to help his co-defendants get away and the video

18

recordings from Deputy Dixon's body camera showing that Garcia-Solis shot Deputy Dixon multiple times before Deputy Dixon returned fire reflect that, even if Garcia-Solis did not "intend" to kill the deputy, the act of shooting at him shows an "abandoned and malignant heart," OCGA § 16-5-1 (b), and is more than enough to support Garcia-Solis's conviction for malice murder. *Scoggins*, 317 Ga. at 836 (1) (a).

2.  Garcia-Solis next contends that the trial court erred in denying his motion to transfer venue under OCGA § 17-7-150[8]

---

[8] This statute provides that

[t]he defendant, in any criminal case in which a trial by jury is provided, may move in writing for a change of venue, whenever, in the defendant's or defense counsel's judgment, an impartial jury cannot be obtained in the county where the crime is alleged to have been committed. Upon the hearing of the motion it shall not be necessary to examine all persons in the county liable to serve on juries, but the judge shall hear evidence by affidavit or oral testimony in support of or against the motion. If, from the evidence submitted, the judge is satisfied that an impartial jury cannot be obtained to try the case, the judge shall grant a change in venue. The judge shall transfer the case to any county that may be agreed upon by the prosecuting attorney and the defendant or the defense counsel, to be tried in the county agreed upon. The judge has the discretion to reject any county agreed upon; if a county is not thus agreed upon, or if the judge, in the exercise of discretion, rejects a county agreed upon, the judge shall select such county as in the judge's judgment will afford a fair and impartial jury to try the case and have it transferred accordingly.

19

because, in Garcia-Solis's view, there was a high likelihood of prejudice, and he could not receive a fair trial in Hall County due to pretrial publicity. We see no merit to this claim.

"To succeed on a motion for change of venue, 'a defendant must show either that the setting of the trial was inherently prejudicial or that the jury selection process showed actual prejudice to a degree that rendered a fair trial impossible.'" *Moss v. State*, 305 Ga. 878, 881 (2) (828 SE2d 309) (2019) (quoting *Heidt v. State*, 292 Ga. 343, 348 (4) (736 SE2d 384) (2013)). To demonstrate "inherent prejudice," the "record must establish that the publicity contained information that was unduly extensive, factually incorrect, inflammatory or reflective of an atmosphere of hostility." *Heidt*, 292 Ga. at 348 (4) (citation and punctuation omitted). As to actual prejudice, the question for the Court "is not the number of jurors who had heard about the case or had knowledge of those involved in the case," but "whether those jurors who had heard about the case could lay aside their opinions and render a verdict based on the evidence." *Moss*,

OCGA § 17-7-150 (a) (1) (A).

20

305 Ga. at 881 (2) (citation and punctuation omitted). And "[t]he decision to grant or deny a motion for change of venue will not be disturbed absent an abuse of discretion." Id.

Garcia-Solis contends that, here, venue should have been moved both because the setting was inherently prejudicial and because the jury selection led to actual prejudice. Both contentions fail.

With respect to inherent prejudice, Garcia-Solis argues that Macias and Hernandez, two of the State's witnesses at trial, testified that they saw news coverage regarding Deputy Dixon's death the day after the shooting occurred. But, because Macias and Hernandez were witnesses in this case, changing venue would not have made any difference. And Garcia-Solis has not shown or even argued that any of this purported news coverage "contained information that was unduly extensive, factually incorrect, inflammatory or reflective of an atmosphere of hostility." *Heidt*, 292 Ga. at 348 (4). As such, Garcia-Solis has made no showing of "inherent prejudice," and the record does not otherwise support such a claim. Id.

21

With respect to the jury selection, Garcia-Solis argues that, during voir dire, one of the jurors stated that the way the news media portrayed the defendants "caused him to have a somewhat negative opinion of the case," and Garcia-Solis asserts that another juror, in responding to the juror questionnaire, indicated that his friends, co-workers, and family members had expressed negative opinions about the defendants in this case. But Garcia-Solis has not shown that those issues created actual prejudice to the degree that made a fair trial impossible.

A "trial court is not required to strike for cause a potential juror who simply questions his or her impartiality or expresses reservations about his or her ability to set aside personal experiences." *Anderson v. State*, 276 Ga. 389, 390 (2) (578 SE2d 890) (2003) (citation and punctuation omitted). And "it is well settled that a trial court is permitted to objectively question prospective jurors in a manner calculated to determine if they are unalterably prejudiced against the defendant." *Heidt*, 292 Ga. at 349 (5). Here, when questioned further by the trial court, the two jurors at issue

22

explained that they did not have an opinion about the defendants, were willing to listen to the evidence, recognized that the media's portrayal of criminal defendants was not always fair, and affirmed that such media coverage would not impact their ability to be fair and impartial in this case. "Thus, striking [these jurors] for cause was not demanded." *Anderson*, 276 Ga. at 390 (2). And, despite Garcia-Solis's argument about these jurors, neither one was ultimately selected to serve on the jury.

More generally, during voir dire, the trial court asked prospective jurors the proper, statutory questions in determining whether they could be fair and impartial in this case. As a result of that process, only one juror was excused for cause because of his feelings about the case. See *Heidt*, 292 Ga. at 349 (4) (concluding that "an excusal percentage of approximately ten percent is well below the rate that would indicate actual prejudice rendering a fair trial impossible"). And, in denying Garcia-Solis's motion to transfer venue, the trial court, in assessing whether actual prejudice existed, observed that the jury questionnaires revealed most of the jurors

23

"knew little to nothing about the case" and that, during the more than two years since the crimes had been committed, there had been a "global pandemic" and "presidential election," among other significant events. Accordingly, Garcia-Solis has made no showing "that the jury selection process showed actual prejudice to a degree that rendered a fair trial impossible." Id. at 348 (4).

We thus conclude that these circumstances are "not indicative of such prejudice that the trial court's denial of a change in venue was an abuse of discretion," *Moss*, 305 Ga. at 881 (2), and this claim fails.

3. Finally, Garcia-Solis contends that the trial court abused its discretion by sentencing him to life without the possibility of parole because (1) he was 17 years old at the time of the offenses in this case; (2) "[t]he State failed to show that [he] is irreparably corrupt"; (3) he admitted to the jury that he shot and killed Deputy Dixon and committed the other crimes in this case, which revealed "his capacity for remorse and rehabilitation"; (4) he conceded at trial that, given his age, "he did not think through the danger of his actions"; and (5)

this "shift in his understanding over just two years, between age 17 and age 19, demonstrate[d] [his] ability to be rehabilitated." In support of these claims, Garcia-Solis relies on *Veal v. State*, 298 Ga. 691 (784 SE2d 403) (2016), in which this Court held that a sentencing court must do more than simply consider generally a juvenile offender's "youth and its attendant characteristics"; it also had to make a "distinct determination on the record" that the juvenile offender is "irreparably corrupt or permanently incorrigible." Id. at 702-703 (5) (d). We see no merit to these contentions.

As an initial matter, after the United States Supreme Court issued its decision in *Jones v. Mississippi*, 593 U. S. 98 (141 SCt 1307, 209 LE2d 390) (2021), this Court overruled *Veal*. See *Holmes v. State*, 311 Ga. 698 (859 SE2d 475) (2021). In *Holmes*, we concluded that, given the Supreme Court's decision in *Jones*, *Veal* was wrongly decided, and "to the extent that *Veal* suggested a requirement that sentencers provide explicit, on-the-record explanations regarding determinations of permanent incorrigibility and the characteristics

of children, . . . we were mistaken." Id. at 705 (3) (citing *Jones*, supra). We expounded upon this further in *Sillah v. State*, 315 Ga. 741 (883 SE2d 756) (2023), explaining that a sentencing court is not required to make "an explicit factual finding of permanent incorrigibility" and/or "irreparabl[e] corrupt[ion]" before "imposing a discretionary [life without parole] sentence," or to explain "its reason[ing] for imposing" such a sentence. Id. at 752 (4).

In *Sillah*, after determining that "youth [is] akin to a mitigating circumstance," we held that sentencing courts have "wide discretion in determining the weight to give relevant mitigating evidence without having to make particular factual findings about those mitigating circumstances." *Sillah*, 315 Ga. at 752-753 (4) (citation and punctuation omitted). We further held that, "unless the record affirmatively reflects otherwise, the trial court will be deemed to have considered the relevant criteria, such as mitigating circumstances, enumerated in the sentencing rules" in sentencing the defendant. Id. at 753 (4) (citation and punctuation omitted).

Here, there is no evidence that the trial court "misapplied the

26

law," "failed to understand its discretion[,] or failed to consider the evidence presented to it" in imposing a sentence of life without parole upon Garcia-Solis. *Sillah*, 315 Ga. at 751, 754 (4). To the contrary, the record reflects that, during the sentencing hearing, the trial court allowed Garcia-Solis to present mitigating evidence, which the trial court explicitly considered in sentencing Garcia-Solis, along with his age when he committed the crimes at issue. The trial court also stated on the record that it had considered the egregious nature of the crimes committed in this case, as well as Garcia-Solis's actions before, during, and after the commission of those crimes, including "commit[ting] all these burglaries and [ ] kn[owing] it was hot"; "going in with a gun in his hand and a bulletproof vest [ ] to those burglaries"; "gear[ing] back up and roll[ing] with his boys to go do more burglaries"; "shoot[ing] and kill[ing] a police officer"; and, at the hospital after the shooting, "flipping off deputies, acting like he is shooting them with his finger [as a] gun, and groping nurses, kicking nurses, [and] spitting on nurses." The trial court further observed that, after Garcia-Solis

27

shot Deputy Dixon, he "didn't change his behavior," and "[i]f that is not permanently incorrigible and irreparably corrupt, I don't know what is."

Accordingly, given that (1) the trial court was not required to make the explicit findings it made regarding the "permanent incorrigibility" and/or "irreparabl[e] corrupt[ion]" of Garcia-Solis before "imposing a discretionary [life without parole] sentence," *Sillah*, 315 Ga. at 752 (4); (2) the trial court was not required to explain "its reason[ing] for imposing" such a sentence, id.; and (3) the trial court has "wide discretion in determining the weight to give relevant mitigating evidence without having to make particular factual findings about those mitigating circumstances," id. at 752-753 (4); we conclude that the trial court did not abuse its discretion in sentencing Garcia-Solis to life without the possibility of parole in this case, despite his age at the time he committed the crimes at issue.

Based on the foregoing, we affirm Garcia-Solis's convictions in this case.

*Judgment affirmed. All the Justices concur.*


Decided January 28, 2025.

Murder. Hall Superior Court. Before Judge Deal.

*Nicole E. Baker, Ralph J. Villani*, for appellant.

*Lee Darragh, District Attorney, Harold A. Buckler, Assistant District Attorney; Christopher M. Carr, Attorney General, Beth A. Burton, Deputy Attorney General, Clint C. Malcolm, Meghan H. Hill, Senior Assistant Attorneys General, Elizabeth Rosenwasser, Assistant Attorney General*, for appellee.